Commonwealth *v.* Jett, et al., Appellants.

Submitted June 10, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Gary E. Hartman,* Assistant Public Defender, and *Eugene R. Hartman,* for appellants.

*Oscar F. Spicer,* District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., September 23, 1974:

This appeal arises from the appellants' convictions for fraudulent conversion. The appeal raises a novel question concerning the location of title in the property allegedly converted, a Lowry organ. The appellants urge that the lower court erred when it determined that, under the terms of the installment sales contract, title to the property remained in the seller until appellant-buyers paid the balance of the installments due under the contract.

The appellants purchased the organ from the complainant, Menchey Music Service of Hanover, Pennsylvania, on December 24, 1970. After making a down payment and three monthly installments, the appellants defaulted on their payments in April, 1971, and apparently have never made any further payments. The evidence indicates that after September, 1971, the appellants were contacted on several occasions concerning their default, and eventually were served with a writ of replevin. The property could not be replevied, however, because the appellants had sold it.

It is admitted that, with the exception of the question of title, the evidence produced at trial was sufficient to support the verdict. However, under Section 4834 of The Penal Code of 1939 (Fraudulent Conversion of Property),[1] the Commonwealth was required to

---

[1] 18 P.S. §4834 (1963) provides, in pertinent part: "Whoever, having received or having possession, in any capacity or by any

prove more than the fact that Menchey Music Service was entitled to possession of the organ because of the default in installment payments—the Commonwealth had to show that *title* to the organ was in Menchey Music Service: *Commonwealth v. Bartello,* 225 Pa. Superior Ct. 277 (1973); *Commonwealth v. Yocum,* 211 Pa. Superior Ct. 17 (1967); *Commonwealth v. Overheim,* 106 Pa. Superior Ct. 424 (1932). Thus, the question is, under the terms of the sale and the law in effect at the time the transaction took place, did Menchey Music Service have title to the property.

Although this is a criminal case, its resolution depends upon commercial law; to wit, the Uniform Commercial Code.[2] The creation of the Code was sparked by the rapidly widening gap between the realities of modern commercial practice and the antiquated, often abstruse and frequently contradictory body of commercial law which preceded the Uniform Commercial Code. In its present form the Code represents a comprehensive, and highly consistent body of law encompassing most commercial transactions, including the transaction involved in the instant case.[3]

The Code drafters did not favor the retention of the former "single" or "lump" title concepts that had dominated, and confused, commercial law prior to the adoption of the Code.[4] Instead, the drafters of the Code

means or manner, of any money or property, of any kind whatsoever, of or belonging to any other person, or which any other person is entitled to receive and have, fraudulently withholds, converts, or applies the same, or any part thereof, . . . ."

[2] 12A P.S. §1-101 *et seq.* (1970).

[3] For an example of the application of U.C.C. §2-401 to determine the question of title in a criminal case, see *Underwood v. Commonwealth,* 390 S.W. 2d 635 (Ky. 1965).

[4] Under the Uniform Sales Act and common law "title was a matter of intent. . . . The difficulty was that parties often had no intent at all about the location of title because they did not think in these terms." R. Nordstrom, Law of Sales §125 at p. 394, n. 2

chose to largely ignore the "niceties of title," and provide in various sections particular solutions for particular, recurring problems, most importantly insurability and risk of loss.[5] They recognized, however, that problems were likely to arise for which they had provided no specific solutions. Therefore, they included Section 2-401 to treat these less common questions involving title. Section 2-401 provides in part:

"2-401. Passing of Title; Reservation for Security; Limited Application of This Section

"Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

"(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

---

(1970). Indeed, in the instant case, the installment sales contract stated that the seller, upon default, was entitled to all the remedies provided under the Uniform Commercial Code. The contract also provided that "Seller shall retain title to *and* a security interest in the goods."

[5] 1 G. Gilmore, Transactional Guide to the U.C.C. 142-45 (1964).

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest. . . ."

There have been few instances for the courts to interpret this section when an explicit reservation of title after shipment or delivery was concerned.[6] In Pennsylvania there has been only one such case, which is frequently cited with approval. In *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.,* 12 Pa. D. & C. 2d 351 (1957), the court confronted a situation where the seller had explicitly retained title to automobiles it had sold to the bankrupt buyer. The court determined, however, that the retention clause was insufficient to retain title in the seller, and merely operated to create an unperfected security interest. See also *Interstate Tire Co. v. United States,* 12 U.C.C. Rep. 948 (D. Ariz. 1973).

Professor Nordstrom reads Section 2-401 as basically carrying-over the previous rule for locating title (i.e., the intention of the parties). However, he interprets the section to establish two circumscriptions on the parties' agreement: (1) Title may not pass to the buyer prior to identification of the goods to the contract; (2) A reservation of title by the seller to property shipped or delivered to the buyer only creates a security interest. Thus, according to Professor Nordstrom, between the time of identification and shipment or delivery, the parties are free to choose, by explicit agreement, any

---

[6] Professor Nordstrom deems it salutary that most questions which previously were resolved by "discovering" title are now specifically treated in the Code, because even after the enlightened effort of the Code drafters, Section 2-401 presents "construction difficulties which would require extensive litigation if the drafters had continued the pre-Code emphasis on title as the basis for solving commercial problems." R. Nordstrom, supra note 3 at §125.

time or incident to signal the vesting of title in the buyer. Beyond those points the parties are powerless to alter the location of title established by Section 2-401. Other commentators are in substantial agreement. See J. White & R. Summers, Uniform Commercial Code 759-60 (1972); 2 G. Gilmore, A Transactional Guide to the U.C.C. 743 (1964).

The principal reason for the Code's prohibition of retention of title by the seller under an installment sales agreement after the goods have been shipped or delivered to the buyer is that to have allowed such a retention would have created a gaping loophole in Article 9.[7] Were the seller able to retain title to goods delivered to the buyer under an installment sales contract, it would be superfluous for him to file a financing statement to perfect a security interest or draft a security agreement which included a description of the secured property. His retention of title would establish his priority over all secured creditors or even a trustee in bankruptcy, a position taken by the seller in the *Girard Case*, supra, and rejected by the court. "A seller cannot escape the proscriptions of Article 9 by having the buyer agree that title is to remain in the seller until the purchase price is paid. The Code provides that such a reservation (no matter what words are chosen) is no more than the reservation of a 'security interest,' the type of interest to which Article 9 applies." R. Nordstrom, Law of Sales 381 (1970). In limiting the effect

---

[7] Sellers sometimes attempt to avoid the proscriptions of Article 9 by carrying out an installment sale under the guise of a leasing arrangment with an option to buy when the lease expires. Whenever such arrangements are discovered, the courts disregard the form of the transaction and look to its substance. If it appears that the transaction is in reality an installment sale, the "lessor" (seller) will be treated as having an unperfected security interest. See the numerous cases collected in J. White & R. Summers, supra at 762-65.

of a retention of title clause, the Code drafters sought to protect subsequent creditors of the buyer who altered their positions in reliance upon the buyer's title to the collateral. However, they also established the remedies and procedures the seller may or may not employ to realize the protection afforded by his security interest when the buyer defaults, even when there is no question of subsequent third party involvement in the transaction. Thus, the Code places attempts at reserving title uniformly into Article 9. Therefore, we hold that a reservation of title clause in an installment sales contract is inoperative as anything other than a reservation of a security interest. Since the Jetts had title to the organ when they sold it, the sale could not have constituted a fraudulent conversion.[8]

Judgment of sentence is arrested and the appellants are discharged.

JACOBS and PRICE, JJ., concur in the result.

---

[8] The question of whether the Act of June 24, 1939, P. L. 872, §886, 18 P.S. §4886 (1953) constituted a lesser included offense of fraudulent conversion was not raised in this appeal and need not be considered herein. That statute, which made fraudulently removing or secreting property in derogation of a creditor's rights a misdemeanor, has been replaced by a similar provision in the Crimes Code. See 18 Pa. C.S. §4110 (1974).