TOYOTA INDUSTRIAL TRUCKS U. S. A., INC.

v.

CITIZENS NATIONAL BANK OF EVANS CITY, Appellant,

v.

PROMAT CORPORATION.

No. 79–1036.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Sept. 6, 1979.

Decided Dec. 17, 1979.

R. F. Wagner, Brandt, Milnes, Rea & Malone, Pittsburgh, Pa., for appellant.

James G. Park, Melvin L. Moser, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellee, Toyota Industrial Trucks.

Before ALDISERT, ROSENN, and GARTH, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal in a diversity case presents for our consideration two issues requiring interpretation under Pennsylvania law of Article Five of the Uniform Commercial Code dealing with letters of credit. We are asked first to determine whether a particular credit arrangement between a bank and a seller of goods qualifies as a "letter of credit" for Article Five purposes and second, if such a letter of credit exists, whether the seller is required to mitigate any damages it incurs by virtue of a wrongful dishonor of drafts submitted pursuant to the letter of credit.

The present controversy arose in connection with a credit arrangement between Citizens National Bank of Evans City, Pennsylvania (CNB) and Toyota Industrial Trucks, U.S.A., Inc., (Toyota Industrial or Toyota). Under the arrangement, CNB would honor drafts submitted to it by Toyota for shipments of trucks to Toyota's distributor in the Pittsburgh, Pennsylvania area, Promat Corporation, (Promat) not exceeding $50,000 on any one business day. When CNB subsequently dishonored two drafts of approximately $24,000 each, Toyota brought a diversity action, 28 U.S.C. § 1332(a)(1) (1976),[1] in the district court claiming that CNB wrongfully dishonored the drafts because the credit arrangement was a "letter of credit" under Article Five of the Uniform Commercial Code. CNB responded that the credit arrangement was a "line of credit" and that no wrongful dishonor had occurred. Alternatively, it argued that if the arrangement was held to be a letter of credit, Toyota was required to mitigate its damages by protecting the collateral shipped to its distributor Promat. The district court found that the credit arrangement was a letter of credit and that no duty to mitigate damages exists under Article Five. We agree that a valid letter

of credit existed, and that Toyota had no duty to mitigate its damages in this case.[2] We therefore affirm.

### I.

The facts of this case are not in dispute and were stipulated to by the parties in the district court. Toyota Industrial Trucks U.S.A., Inc., was incorporated in September 1974 as a division of Toyota Motors Distributors, Inc. (Toyota Motors), a California corporation. In the spring of 1973, Toyota Motors was interested in retaining a distributor in the Pittsburgh, Pennsylvania area for its forklift trucks. Promat Corporation was selected by Toyota Motors to be its dealer, but before the dealership could be formalized, Toyota Motors required a line of credit to secure payment for its shipment of trucks to Promat. Toyota Motors subsequently entered into negotiations with CNB to establish such a line of credit. Vice-president and branch manager of CNB, Richard Shelton, wrote to Toyota Motors' authorized representative, Ray Tanner, on April 18, 1973, offering to extend a line of credit to Promat in the amount of $50,000. Toyota Motors, however, objected to the form of the agreement and wrote to CNB on May 1, 1973, asking CNB to issue a letter in conformity with Toyota Motors' standard bank revolving credit agreement with other distributors of its trucks. CNB cooperated and executed a letter on May 7, 1973, conforming to Toyota Motors' suggested terms. It is this letter which is the subject of the present controversy.

The letter of May 7, 1973, established a "line of credit" on behalf of Promat as a dealer in Toyota forklift trucks and required CNB to honor drafts covering shipments not "in excess of $50,000 on any one business day." Further, the letter required Toyota to attach to the drafts invoices and bills of sale evidencing title to the vehicles. CNB reserved the right to cancel the agreement by written notice at any time.

1. Toyota is a California corporation and CNB has its principal place of business in Pennsylvania. The district court properly applied Pennsylvania law as the law of the state in which the transaction took place.

2. As will be discussed *infra*, we need not decide whether mitigation is required in letter of credit transactions.

Toyota Motors sold its forklift truck product line to Toyota Industrial on December 31, 1974. As a part of this sale, Toyota Motors assigned all its rights arising under the credit arrangement with CNB dated May 7, 1973. Notice was sent to CNB evidencing such an assignment. From 1973 to 1976 CNB subsequently honored nineteen drafts submitted pursuant to the May 7, 1973 letter. CNB honored all of these drafts within thirty days of their presentment. From the first quarter of 1974 through 1975, CNB, without Toyota's knowledge, only paid the drafts *after* Promat had deposited sufficient funds with CNB to cover them. CNB also without Toyota's knowledge unilaterally altered the credit line available to Promat by reducing its maximum available credit from $50,000 to $25,000. CNB apparently altered both the procedure for honoring the drafts and the amount of available credit because of Promat's worsening financial position.

In August of 1975, Shelton was replaced by William T. Elliot as vice-president and branch manager of the CNB office with which Promat did business. In January of 1976, Promat's outstanding indebtedness to CNB was in excess of $32,000. Toyota presented a draft on January 7, 1976, in the amount of $24,425.52 with invoices for three forklift trucks that had been shipped to Promat. CNB did not honor this draft. Over a month passed without payment and on February 17, 1976, Toyota presented another draft in the amount of $24,330.75 with invoices representing shipment of three more forklift trucks to Promat. Up to this time, CNB had given Toyota no notice that it intended to dishonor any submitted drafts. The January 7 draft was apparently not paid because Promat failed to deposit sufficient funds to cover it. Similarly, Promat failed to deposit sufficient funds to cover the February 17 draft and Elliot, apparently without knowledge of the May 7, 1973 letter agreement with Toyota, dishonored both drafts and returned them unpaid to Toyota. Toyota objected to the dishonor of the two drafts and brought the letter agreement of May 7, 1973, to Elliot's attention at a meeting on March 8, 1976.

CNB subsequently exercised its right to cancel the May 7, 1973 letter on March 17, 1976.

Promat advised both Toyota and CNB that it anticipated selling the six forklift trucks, which were the subject of the January and February dishonored drafts, to 84 Lumber Company and that the payment for those trucks was anticipated to cover the two drafts. Toyota and CNB apparently relied on Promat's assurances of payment and did nothing to prevent the sale to 84 Lumber. At the time of the March 8, 1976 meeting between Toyota and CNB, three forklift trucks were still on the premises of Promat. At this time, Toyota knew that CNB did not intend to honor the drafts. CNB had perfected Article Nine security interests in Promat's accounts receivable and inventory and Toyota had a repurchase option in its dealer contract with Promat. Toyota's representative, Tanner, recommended to his corporate superiors on April 8, 1976, that the three lift trucks not yet shipped to 84 Lumber Company be repossessed, but this recommendation was rejected by Toyota. Tanner's recommendation was based on his perception of Promat's poor financial condition. Toyota took no steps to assure payment directly to it for the three trucks yet to be delivered to 84 Lumber Company. No arrangement existed with 84 Lumber for direct payment of the trucks to CNB. Toyota's eventual attempt on June 23, 1976, to collect directly from Promat proved unsuccessful.

Toyota brought a diversity action in the district court seeking to hold CNB for the wrongful dishonor of the two unpaid drafts. Asserting that the letter of May 7, 1973, was a letter of credit under Pennsylvania's codification of Article Five of the Uniform Commercial Code, 12A P.S. §§ 5–101–5–117 (Purdon 1970), Toyota demanded judgment in the amounts covered by the above dishonored drafts plus interest. CNB defended on the ground that the credit agreement was only a "line of credit" which did not qualify as a letter of credit under Article Five. Even if the document was a letter of credit, CNB contended that Toyota was re-

quired to mitigate its damages under U.C.C. § 5–115 by preventing further shipments of trucks to Promat and by Promat to its customer 84 Lumber Company. CNB also joined Promat as a third party defendant and upon Promat's failure to appear, a default judgment was entered against it. The district court subsequently rejected CNB's defenses and entered judgment for Toyota in the amount of $24,425.52 plus six percent interest from January 7, 1976 to the date of the court's order and $24,330.75 plus six percent from February 17, 1976, to the date of the order, plus costs.

## II.

■ Letters of credit have been commonly used in commercial transactions for centuries.[3] A letter of credit is essentially a promise by the "issuer," (commonly a bank) to the "beneficiary," (usually a seller of goods) to extend credit on behalf of the beneficiary's customer, (usually a buyer of goods).[4] A credit arrangement between a bank and a seller need not state that it is a letter of credit before the agreement is covered by Article Five of the Uniform Commercial Code. The U.C.C. provides that Article Five applies

> (a) to a credit issued by a bank if the credit required a documentary demand for payment; . . . .

12A P.S. § 5–102(1)(a). Thus, a letter of credit may arise when a bank agrees to extend credit on behalf of the seller's customer by honoring drafts substantiated by documentation of the transaction. There are, however, certain formal requirements that must be met before an Article Five letter of credit is established. The letter must be forwarded to the beneficiary, id. § 5–106(1)(b), and the letter must be signed, id. § 5–104(1). Although letters of credit

require no consideration, id. § 5–105, they are nonetheless binding obligations.

■ The key issue in this case is whether the letter agreement between Toyota and CNB of May 7, 1973, constituted an Article Five letter of credit. CNB argues that the parties intended only a "revolving line of credit" by which CNB would extend an aggregate amount of credit on behalf of Promat not to exceed $50,000 on any one business day. Under CNB's interpretation of the letter, it would have been obligated to extend only that amount of credit, which when added to Promat's existing liability to the bank, equaled no more than $50,000. Thus, if Promat owed CNB $30,000 on a given day, CNB would be only required to honor drafts submitted by Toyota up to $20,000. The district court disagreed and found that the letter of May 7, 1973, was a valid letter of credit creating a $50,000 daily credit directly available to Toyota and that CNB's unilateral reduction of Promat's available credit had no effect on the May 7, 1973 letter. The district court concluded that CNB wrongfully dishonored the two drafts submitted by Toyota in January and February 1976. We agree.

The letter of May 7, 1973 meets the Article Five tests for a letter of credit. It specifies that CNB will honor documented drafts submitted by Toyota not to exceed $50,000 "for shipments or deliveries on any one business day." The letter was signed and sent to Toyota. Nothing more was required to establish the instrument as a letter of credit. Further, the letter specified that the credit arrangement was to be continuous until revoked by CNB upon written notice to Toyota. No conditions apart from documentation were included in the agreement. CNB's actions without notice to Toyota requiring Promat to first

---

**3.** Letters of credit trace their origin to antiquity. There is evidence that letters of credit were used in ancient Egyptian, Phoenician, Greek and Roman commercial transactions. Trimble, *The Law Merchant and the Letter of Credit*, 61 Harv.L.Rev. 981, 984 (1948).

**4.** Letters of credit may issue in non-sale of goods transactions as well. The U.C.C. defines issuer as "a bank or other person issuing cred-

it." 12A P.S. § 5–103(1)(c). A beneficiary of credit is "a person who is entitled under its terms to draw or demand payment." Id. § 5–103(1)(d). A customer is a "buyer or other person who causes an issuer to issue credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer." Id. § 5–103(1)(g).

deposit sufficient funds to cover the drafts and reducing Promat's available credit could not relieve the bank of its obligation under the May 7, 1973 letter. The U.C.C. provides:

> Unless otherwise agreed once an irrevocable credit is established as regards . . . the beneficiary it can be modified or revoked only with his consent.

12A P.S. § 5–106(2). The question then is whether CNB's dishonor of the two drafts submitted in 1976 was "wrongful."

Under Article Five "[a]n issuer must honor a draft or demand for payment which complies with the terms of the relevant credit . . . ." Id. § 5–114(1). Judge Teitelbaum appropriately found that "[t]he drafts were otherwise in compliance with the terms of the letter and were, therefore, improperly dishonored." Toyota complied with the terms of the letter by supplying the necessary documentation with the submitted drafts. No other action was required on its part.

Much of CNB's argument on appeal is that the term calling for CNB to honor drafts not in excess of $50,000 for shipments or deliveries on any one business day is ambiguous and that the district failed to consider the prior dealings of the parties. Such dealings, CNB asserts, would establish the agreement as only establishing an aggregate maximum credit for Promat. Thus, it would not have been wrongful for CNB to dishonor the two 1976 drafts because when added to Promat's existing indebtedness, both would have exceeded the $50,000 maximum credit available.

■ The problem with CNB's position on appeal is that its argument in the district court concerning the prior dealings of the parties was directed at establishing the letter as a revolving credit line and not as a letter of credit. Upon careful examination of the record, we are unable to discover that CNB ever argued that even if it had issued a letter of credit, it did not wrongfully dishonor the drafts because if it had paid them it would have exceeded an aggregate $50,000 available to Promat. The issues of law set forth in the pre-trial stipulation

executed by the parties do not raise this argument. Hence, we decline to consider this argument now raised for the first time on appeal. *Cady v. Twin Rivers Towing Co.*, 486 F.2d 1335, 1337 (3d Cir. 1973). We, therefore, affirm the district court's finding that CNB had wrongfully dishonored the January 7 and February 17, 1976, drafts.

### III.

We next turn to the issue of damages. The district court determined that under U.C.C. § 5–115(1) Toyota was entitled to recover the face amount of the dishonored drafts plus interest from the date of their presentment to the date of judgment. The court rejected CNB's argument that Toyota had a duty to mitigate its damages under section 5–115(1) because "such a theory of mitigation if here accepted would negate the essential purpose of the U.C.C. concept of the letter of credit by relieving the issuer of its primary and sole responsibility on the letter."

The beneficiary's remedy for wrongful dishonor of drafts submitted pursuant to a letter of credit is set forth in U.C.C. § 5–115(1):

> When an issuer wrongfully dishonors a draft or demand for payment presented under a credit the person entitled to honor has the rights of a person in the position of a seller (section 2–707) and may recover from the issuer the face amount of the draft or demand together with incidental damages under section 2–710 on seller's incidental damages and interest but less any amount realized by resale or other use or disposition of the subject matter of the transaction. In the event no resale or other utilization is made of the documents, goods or other subject matter involved in the transaction must be turned over to the issuer on payment of judgment.

12A P.S. § 5–115(1).

■ It is readily apparent from the text of section 5–115(1) that the Code provides no explicit duty to mitigate damages. On the other hand, section 5–115(1) does not

automatically require the face amount of the draft to be the sole measure of damages. If the seller voluntarily mitigates his damages by "resale or other use or disposition of the subject matter of the transaction," his judgment against the issuer will be accordingly reduced. A noted commentator on the U.C.C. has stated:

> Code 5–115(1) does not expressly impose or negate a duty to mitigate damages on the part of a person aggrieved by the breach of the obligation of the letter of credit.

R. Anderson, Uniform Commercial Code, § 5–115:4 at 426 (2d ed. 1971). Whether Pennsylvania would impose a duty to mitigate on the seller in a letter of credit case, has not yet been decided by the Pennsylvania courts. We need not predict, however, whether Pennsylvania courts would adopt or reject such a rule because, assuming arguendo that a duty to mitigate damages is cognizable in Article Five transactions, CNB has not established on this record that Toyota had a duty to mitigate.[5]

■■ The concept that the party injured by a breach of contract is under a duty to mitigate his damages has been an established part of contract law for many years. The principle has been recognized in the Restatement of Contracts and by the Pennsylvania courts. Restatement of Contracts § 336 (1932); *Thompson v. DeLong*, 267 Pa. 212, 110 A. 251 (1920); *Contractor Industries v. Zerr*, 241 Pa.Super. 92, 359 A.2d 803, 807 (1976). The term "duty to mitigate" damages has been interpreted to mean that "damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and therefore, are not to be charged against him." 11 Williston on Contracts, § 1353 at 274 (3d ed. 1968). When mitigation is appropriate, the test to be applied to the plaintiff's conduct is

whether the conduct taken in response to the defendant's breach was reasonable. *Id.; Krauss v. Greenbarg*, 137 F.2d 569, 573 (3d Cir.) (applying Pennsylvania law), *cert. denied*, 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477 (1943). Reasonable conduct "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1951). We have held, however, that

> [w]here both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect a defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. . . . The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of the performance.

*S. J. Groves & Sons v. Warner Co.*, 576 F.2d 524, 530 (3d Cir. 1978) (applying Pennsylvania law) (citations omitted). Further, the plaintiff is not held responsible for avoiding losses "if the defendant himself prevents the plaintiff from taking steps necessary to avoid them." 5 Corbin on Contracts, § 1039 at 250–51 (1964). The burden of proof on avoidable consequences is on the party who has breached the contract. *Id.* at 251.

CNB argues that Toyota should have mitigated its damages in two ways. CNB first contends that a "reasonable and prudent businessman" would not have shipped an additional three trucks to Promat and submitted a second sight draft on February 17, 1976, knowing that a sight draft submitted on January 7, 1976, had not been paid by the bank. CNB argues that Toyota had a

---

5. Two decisions have indicated that the doctrine of mitigation of damages is appropriate in letter of credit cases. *Wichita Eagle & Beacon Pub. Co. v. Pacific Nat. Bank of San Francisco*, 343 F.Supp. 332, 340 (N.D.Cal.1971) *rev'd on other grounds*, 493 F.2d 1285 (9th Cir. 1974); *Maurice O'Meara Co. v. National Park Bank*, 239 N.Y. 386, 146 N.E. 636, 640 (1925). Anderson observes that the Code "concept of good faith and the requirement of observing reasonable commercial standards may warrant the finding of the existence of a duty to mitigate in a given case." Anderson, *supra* at 426.

duty to investigate the reasons behind the non-payment of the January 7, 1976 draft before shipping additional trucks to Promat. CNB maintains that it would not have been an undue burden or hardship for Toyota to have telephoned CNB to determine the reasons behind the non-payment of the first sight draft. CNB concludes, that at most, Toyota was entitled to only the face amount of the first draft plus interest from the date of wrongful dishonor.

Second, CNB argues that after February 23, 1976, when Toyota knew that the two drafts would not be honored by CNB, Toyota should have taken steps to preserve the value of the lift trucks in Promat's possession. CNB met with Toyota's representative on March 8, 1976, to discuss the dishonored drafts. Toyota on the same day visited Promat and determined that the three lift trucks shipped pursuant to the February 17, 1976 draft were still on Promat's premises awaiting shipment to Promat's customer, 84 Lumber Company. CNB claims that Toyota was aware of Promat's poor financial condition but did nothing to repossess the trucks or to assure Toyota's payment for them. CNB also points to the recommendation by Toyota's representative, Tanner, on April 8, 1976, that the trucks be repossessed, a recommendation rejected by his corporate superiors. CNB concludes that Toyota's failure to protect the collateral in Promat's possession at the time when it knew no payment was forthcoming from either CNB or Promat was evidence of commercially unreasonable action taken in bad faith.

Toyota responds by arguing that even if there is a duty to mitigate in a letter of credit transaction, CNB had perfected security interests in the trucks that it could have enforced to protect the collateral, thereby avoiding any loss. Hence, Toyota argues that mitigation in any event would be inappropriate.

■ We reject CNB's initial argument that a duty to mitigate damages could arise before it dishonored both of the submitted drafts. Although Toyota did ship three additional trucks to Promat without having received payment for the January 7, 1976 draft, we do not think that Toyota's actions were manifestly unreasonable or in bad faith. Toyota had received no formal notice from CNB that it intended to dishonor the January 7, 1976 draft. Although a delay in payment of more than thirty days might arouse suspicion in a reasonable seller, CNB had never before dishonored Toyota's drafts. Payments had occasionally been made only after a month's delay. Toyota could reasonably have assumed that the delay in payment was due to clerical delays in the payment process. Hence, even if mitigation were required, we find no duty to mitigate damages on Toyota's part prior to the dishonor of the second draft on February 17, 1976.

■ Toyota's actions subsequent to the formal notice of dishonor following submission of the February 17, 1976 draft are more suspect. After the March 8, 1976 meeting between Toyota and CNB, Toyota knew for a certainty that CNB had no intention of honoring the two drafts. At this time, Promat still had on its premises the three forklift trucks shipped to it by Toyota pursuant to the February 17, 1976 draft. Promat in turn expected to sell these trucks to its customer 84 Lumber Company. CNB and Toyota stipulated that they relied on representations from Promat's president that he would be able to cover the two dishonored drafts after delivery to and payment from 84 Lumber and they therefore took no affirmative action to protect the collateral. Although this representation may have reasonably led Toyota to refrain from taking any affirmative action toward the collateral for a period of time, subsequent events may have made any such forbearance commercially foolhardy. On April 8, 1976, Toyota's representative had recommended to his corporate superiors that repossession of the three trucks was necessitated by Promat's worsening condition. By April 15, 1976, financial statements submitted by Promat to Toyota made it formally aware of Promat's imminent collapse. Toyota chose to do nothing. It failed to repossess the trucks by exercising its repurchase option in its dealership agreement with Promat. Further, Toyota

took no steps to guarantee that the three trucks to be delivered to 84 Lumber Company would be paid by 84 Lumber directly to Toyota.

However, Toyota's failure to protect the collateral may be excusable if CNB itself could have equally commanded such protection. CNB throughout its dealings with Promat had perfected Article Nine security interests in Promat's inventory. CNB took a number of chattel mortgages covering "all accounts receivable and inventory including proceeds both present and future but not limited to the proceeds from inventory and receivables both present and future," as security for Promat's promissory notes. These mortgages related back to an original financing statement filed in June 1973. It appears that these mortgages established a perfected floating lien by which all present or after-acquired inventory in Promat's possession became subject to CNB's security interest. Under the terms of these security agreements, CNB retained the right to repossess the collateral in the event of Promat's insolvency or when CNB deemed itself inadequately secured.

Toyota's dealership agreement with Promat specified that title to the trucks remained in Toyota which retained the right to retake and resell the trucks until it had collected the full amount of the purchase price. The effect of this reservation of title, however, is limited by U.C.C. § 2–401(1) to the reservation of a security interest:

> Any retention or reservation by the seller of title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.

Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed to by the parties.

12A P.S. § 2–401; see *Commonwealth v. Jett*, 230 Pa.Super. 373, 326 A.2d 508, 510 (1974). Article Nine of the U.C.C. subjects an Article Two seller to the normal rules governing secured transactions. Except in circumstances where the buyer has not, or has not lawfully obtained possession of the goods, an Article Two seller may not obtain priority to the goods unless he has perfected a security interest in them. 12A P.S. § 9–113; *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.*, 12 Pa.D. & C. 2d 351 (1957). The evidence discloses that the trucks shipped by Toyota were in Promat's possession at the time the drafts were dishonored. There is no evidence in the record which indicates that Toyota ever perfected a security interest in these trucks pursuant to the dealership agreement. Hence, Toyota's section 2–401 rights were subordinate to CNB's perfected security interests.[6]

The foregoing leads to the conclusion that both parties could have protected the collateral by exercising their rights to repossess it, although Toyota's reclamation of the trucks would have been subordinate to CNB's perfected Article Nine interests. Hence, even if a duty to mitigate existed, Toyota could not be charged with that obligation as it is evident that CNB could itself have mitigated damages by repossessing the trucks under its security agreements with Promat. As Judge Weis stated in *S. J. Groves & Sons, supra*, 576 F.2d at 530:

**6.** Even if Toyota had no perfected security interests in the trucks, it nevertheless had the right as a seller under Article Two, to reclaim the trucks upon discovering Promat's insolvency. 12A P.S. § 2–702. Hence, it could have exercised a right of reclamation over the three trucks still in Promat's possession. But if Toyota had reclaimed the trucks, they would have been subject to CNB's perfected Article Nine interest in them:

> The seller's right of reclamation is inferior to a perfected security interest in the goods arising under an after-acquired property clause. Section 2–702(3) subordinates the

> seller's right to reclaim to the rights of a "good faith purchaser" under section 2–403, which in turn provides that "a person with voidable title has power to transfer title to a good faith purchaser for value." The buyer whose goods are subject to the seller's right of reclamation has "voidable title." . . . Consequently, the holder of a perfected security interest prevails over a seller attempting to reclaim goods delivered to an insolvent buyer.

Notes and Comments, *Selected Priority Problems in Secured Financing Under the Uniform Commercial Code*, 68 Yale L.J. 751, 758 (1959).

"[T]he duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract had equal opportunity for performance and equal knowledge of the consequences of the performance." Therefore, under the facts of this case, we hold that Toyota had no duty to mitigate its damages.

### IV.

In sum, we hold that the letter agreement of May 7, 1973, constituted a valid Article Five letter of credit and that Toyota was under no obligation to mitigate its damages because CNB was in an equal if not superior position to avoid the loss. Accordingly the judgment of the district court will be affirmed. Costs taxed against the appellant.