# Kiselak v. Pevar

C.P. of Chester County, No. 2012-11413

*Linda F. Berman*, for plaintiff.
*Thomas E. Martin, Jr.*, for defendants.

TUNNELL, *J.*, Dec. 2, 2014—Water intrusion bedevils buyers and sellers of homes. It is a pernicious and unwelcome guest. Sometimes the results from leaks are patent, even as the causes remain latent and elusive. And so it was in this case. Of the many counts brought against the sellers of the residence in this case, the plaintiff succeeds in two, for breach of contract and of the implied warranty of habitability. The court thus finds in his favor and awards the cost of repairs to the roof.

## FINDINGS OF FACT

1. Plaintiff, Mathew Kiselak, is an adult individual

residing at 64 Devon Road, Paoli, PA 19301.

2. Defendant, Marc Pevar and Susan Pevar, his wife (hereinafter "the Pevars"), are married individuals residing at 606 Ridge Avenue, Kennett Square, PA 19348.

3. Defendant, The Pevar Company, is a business entity with a place of business at 606 Ridge Avenue, Kennett Square, PA 19348.

4. Marc and Susan Pevar were the owners of a parcel at 64 Devon Road, Paoli, PA, improved by a residence which they purchased in 2005.

5. Marc Pevar (hereinafter "Pevar") is an experienced builder and vendor of single-family residences and townhouses.

6. Pevar decided to tear down the existing house on this parcel and build a high-end residence.

7. Susan Pevar was not involved in this project other than as an owner of the parcel attending settlement, is not a builder and did not manage any of the new construction.

8. The new house was partly built when the housing market collapsed during the recession; Pevar decided to ride it out.

9. Some appreciable time elapsed until Pevar was able to bring the new house to a point where he could market it as an "incomplete" house being sold "in as is condition," and "without any warranty."

10. The house was not occupied.

11. Pevar listed the house on the market through his real estate agent, Boris Grimberg with Century 21 Alliance West Chester.

12. Marc and Susan Pevar signed a seller's property disclosure statement on June 29, 2011. Paragraph 6(a) asks: "Are you aware of any past or present water leakage in the house or other structures?" The Pevars checked "No." (Ex. P-4.)

13. Plaintiff Kiselak became interested in the property and communicated this through his agent Tom Burlington with Duffy Real Estate, Inc.

14. Kiselak was given a copy of the seller's property disclosure statement and countersigned it on July 29, 2011.

15. On that same date, Kiselak made a written offer to purchase the property "as is" and "without any warranty", other than a one-year warranty from HomeTrust Warranty which the sellers would provide for at a cost not to exceed $519.00. This warranty did not extend to any of the conditions in issue.

16. The Pevars accepted the offer on July 30, 2011, forming an agreement. (Ex. P-5.)

17. The agreement of Sale also contained the following term:

21(A) ... This agreement contains the whole agreement between the seller and the buyer, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale...

(B) Unless otherwise stated in this agreement, buyer has inspected the property...before signing this agreement or has waived the right to do so, and agrees to purchase the property in its present condition, subject to inspection contingencies elected in this agreement.

18. The buyer availed himself of the opportunity to have a home inspection performed, hiring Key Building Inspections, LLC for that purpose ("Key").

19. The written inspection report by Key is dated August 1, 2011.

20. The Key report informed Kiselak that certain conditions should be "monitored", which Key defined as denoting "a system or component needing further investigation and/or monitoring by the resident and/or a specialist of that system in order to determine if additional repairs are needed," including:

a. a stucco patch at a garage roof, a "vulnerable roof area";

b. caulking where observed under the stucco;

c. caulking where observed at beams of second floor deck;

d. moisture penetration at front wall of basement especially near the sump pump;

e. stone mortar in contact with the shingles, and kick out flashing absent where stucco meets gutters in several "vulnerable" areas;

f. attachment of decks to house is atypical; normally there would be flashing involved between the house and deck supports.

21. Kiselak decided to retain the services of an expert in stucco, roofing and moisture issues, Tillman Inspections, LLC, which did a further inspection.

22. The written report from Tillman dated August 4, 2011 found the following "defects":

a. total lack of kick out flashings at all set back eaves;

b. in certain location(s) the mortar for the stone is in direct contact with the roof shingles, which can cause leakage; repairs were suggested;

c. sealant methods did not meet standards;

d. active water intrusion was noted below the cantilevered deck;

e. the support beams for this deck lacked proper flashing; obvious openings were noted needing correction.

23. The Tillman report concluded that if the interested parties had further concerns, more invasive measures were advised. (Ex. D-2.)

24. Settlement was moved up to August 23, 2011.

25. On August 11, 2011, Kiselak prepared an "addendum to the agreement of sale" obligating the sellers to complete a number of items prior to settlement. (Ex. P-7.)

26. In pertinent part, the addendum states:

**8.1 Finish the stucco under deck doors and at beams, caulk where stucco abuts other materials.*

8.2 Recaulk basement window jamb as needed.*

8.3 Install kickout flashings in shingle system to divert water away from walls and into gutters.*

*Indicates explanatory details a separate letter incorporated by reference with this addendum.

**Finish stucco under deck doors, including the proper step flashing.

27. The "separate letter" incorporated into the

addendum, prepared by Pevar, contained the following terms:

8.1 "Finish the stucco under deck doors and beams, caulk where stucco abuts other materials."

Explanation: The stucco was no 100% installed under the two deck doors. Seller will finish the installation and will apply silicone caulk at the seams where dissimilar materials abut.

8.2 "Recaulk basement window jamb as needed."

Explanation: Buyer's inspector did not cite any location where the silicone caulk failed and needs to be repaired. Seller inspected the silicone caulk and found that it had failed at one location, on the right side of the gable-side window into the basement. The caulk failure was caused because some stucco finish streaks had not been cleaned from the window jamb before the caulk was installed. When the caulk cured, it pulled the stucco streaks from the plastic window jab, leaving an uncaulked gap.

\* \* \* \*

8.3 "Install kick out flashings in shingle system to divert water from walls and into gutters." The IRC-2003 does not require kick-out flashing. The Township Building Inspector approved the roofing system as-is. Two other homes built 3 to 4 years ago near the intersection of Devon and Valley Roads have no kick-out flashing.

As a good-will gesture, the seller will, at seller's expense, install kick out flashings in the shingle system to divert water away from walls and into gutters. Because this is a retro-fit, and to avoid visible stucco patches, these

flashings will be installed so that their bottom leg under-laps the shingles, where they will be caulked and nailed in place. They will have a 3" high leg (acting as a diverter) and installed at an angle relative to the shingles. Additionally, the flashing's vertical edge that is next to the wall will have a stiffening leg that will be caulked and fastened into the stucco wall.

As a consequence, these flashings will be slanted to divert the rainwater away from the stucco walls and will reduce the flow of water into the gutters where gutters are next to the wall. At the one location where the garage and house wall join, this should greatly reduce the flow of water near the house and should result in less water over-shooting the gutter and running against the house wall. The flashing at that location will be approximately two-feet long. All other flashings will be sized no less than the minimum required for flashings by the IRC-2003. (Ex. D-31.)

28. Pevar sent certain contractors out to the home, namely K&R Renovations, Inc. and Tru Wood Exteriors, to effect repairs.

29. K&R Renovations, Inc. and Tru Wood Exteriors are named defendants in this case, but both settled plaintiff's claims against them on joint tortfeasor releases before trial.

The consideration paid to plaintiff was:

K&R Renovations, Inc.    $6,000 (Ex. P-1.)

Tru Wood Exteriors       $3,500 (Ex. P-2.)

30. The owner of Tru Wood Exteriors, Sam Stoltzfus, advised Pevar on August 17, 2011 that he had installed kick out flashings in five locations on the roof, that the

gutters and downspouts were checked and adjusted, and there was no sign of clogging or blockage. (Ex. P-8.)

31. When he settled on the property on August 23, 2011, Kiselak thought that all items on the addendum had been completed.

32. A heavy rainstorm occurred on September 1, 2011, before Kiselak moved into the property. He went over to the house and discovered that sheetrock on the back side of the house was damaged.

33. Kiselak contacted Pevar, who came to the property along with Mr. Stoltzfus of Tru Wood Exteriors.

34. Stoltzfus pulled some of the gutter off and saw bare wood behind it instead of stucco. He testified that ordinarily, stucco is applied first and then the gutter is installed, but it appeared here that the gutter was installed first and the stucco then put around the gutter. The condition allowed water to intrude, wetting the sheetrock.

35. Water from the storm had also entered the house causing damage to the hardwood floors.

36. Pevar agreed to repair the damaged sheetrock.

37. Kiselak called Tru Wood Exteriors back in order to perform a further inspection of the roof. Mr. Stoltzfus of Tru Wood Exteriors recommended removing 15 feet of shingles from the roof and applying rubber underneath to guard against water backing up due to lack of drainage capacity from the existing 4" gutter system.

38. Pevar refused to perform this work.

39. Consequently, on September 2, 2011, plaintiff paid Tru Wood Exteriors to strip off the existing shingles and installed a new rubber roof underneath them, and also to

34

caulk the exterior light fixtures, totaling $1,335.00. (Ex. P-9.)

40. At this time, Tru Wood Exteriors finished installing kick out flashing, flashing around the cantilevered deck, and caulked deck beams where water intrusion had been noted.

41. Although it was unclear when this occurred, during a conversation between Kiselak and Pevar, Pevar was asked about the buckling of the hardwood floor by the fireplace. Pevar responded to the effect that when the house was being constructed because a storm was imminent, he had decided to wait to apply the stucco; water had gotten in, but now since the stucco was installed there was no issue.

42. Another statement made by Pevar was that the garage walls were insulated; later that was discovered not to be the case.

43. Three and a half months later, on December 20, 2013, Kiselak discovered water wetting the sheetrock in the garage. He called Mr. Stoltzfus out whereupon it was discovered that this was the same problem as the prior condition in the back of the house, caused by gutters butting up against the stucco, and there being no stucco behind them.

44. Kiselak bid the job out and entered into a home improvement contract with W.L. Geesaman Contracting to install additional kick out flashing, remove the gutter, fill in voids where the gutters meet the wall and reinstall the gutters. (Exs. P-11, P-12, P-13.)

45. The Geesaman estimate was $3,000 which was over $1,000 less than Tru Wood's bid.

46. While Geesaman was doing the work, Geesaman

discovered additional water intrusion problems which damaged the substrate, structural lumber and insulation, band board, stucco and stone in the areas above the dining room and living room.

47. Geesaman informed the plaintiff that the prior repairs by Tru Wood Exteriors were faulty and worthless; the water diverters were installed outside of the stucco and nailed in place directly through the shingles.

48. This resulted in a change order from Geesaman to which Kiselak agreed on February 14, 2012. The total charge he paid was $10,220.

49. On January 25, 2012, Pevar sent an email to Kiselak in which he stated:

a. At the time the stucco was being applied he was experiencing a lot of rain and a possible hurricane, which would ruin the stucco. It was thought prudent to put the gutters on first for that reason, whereas ordinarily he would have installed the gutters after the stucco;

b. Lack of stucco behind the gutters might cause leaking and, regardless, should have been installed there. He faulted his stucco subcontractor in not doing a complete job;

c. The missing stucco was not noted by the stucco company's owner, nor by the township inspector, nor Pevar, nor Kiselak's two inspectors, nor Mr. Stoltzfus of Tru Wood Exteriors.

50. Shortly after settlement, Kiselak and his family moved into the home and have continued to reside there for over three years to date.

51. In June of 2012, Geesaman replaced 4" inch with 6" inch gutter on the rear of the house for additional capacity to handle rain water, for a charge of $250.

52. On March 20, 2013, Kiselak paid Geesaman $4,665 to address another roof leak due to flashing issues. Geesaman was required to remove and reinstall flashing and shingles in several areas on the roof, also adding an ice and water shield. (Ex. P-54.)

53. Plaintiff's damages are summarized as follows:

$ 1,335.00 (Tru Wood Exteriors)

10,220.00 (W.L. Geesaman contracting)

250.00 (W.L. Geesaman contracting — Ex. P-18.)

4,665.00 (W.L. Geesaman contracting — Ex. P-54.)

Total $16,470.00

- 6,000.00 (K&R Renovations, Inc.)

$10,470.00

- 3,500.00 (Tru Wood Exteriors)

Net $ 6,970.00

54. Plaintiff's counsel has submitted timesheets for legal services billable at $250 an hour (Ex. P-58) which she represented totaled $32,125.

## DISCUSSION

Kiselak brought claims against Marc and Susan Pevar for fraudulent and negligent misrepresentation, for violating the Unfair Trade Practices and Consumer Protection Law, for breach of contract and of the implied warranty of habitability and for negligence.

Curiously, the plaintiff did not bring a direct action under the real estate seller disclosure law, 68 Pa. C.S.A. §7301, et seq., instead just referring to the Pevars' answer on the disclosure statement regarding a lack of knowledge of any prior water leakage as the evidentiary basis for other claims.

For example, in Count I, alleging fraudulent misrepresentation, the complaint states that "Marc Pevar stated in the disclosure statement that he was not aware of any past or present water leakage in the house or other structures." (Complaint, ¶53.)

Count II, asserting negligent misrepresentation, is similar. In addition to the foregoing allegation, it avers that Marc and Susan Pevar "knew that the stucco placed on the house was inadequate, and that the garage had not been properly insulated." (Complaint, ¶61.)

Both counts must necessarily fail as they violate the "gist of the action" doctrine.

This doctrine has been developed by the courts in order to maintain the conceptual distinction between breach of contract and tort claims. *eToll, Inc. Elias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. 2002). Under this doctrine, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of a contract, and not by the larger social policies embodied by the law of torts. When a plaintiff alleges that a defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the "gist" of it sounds in contract or tort; a tort claim is maintainable only if the contract is "collateral" to conduct that is primarily tortious. *Harleysville Homestead, Inc. v. Lower Salford Twp. Auth.*, 980 A.2d 749, 753 (Commw. Ct. 2009). Claims of fraud

in the performance of contract are generally barred under the "gist of the action" doctrine. *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. 2005). In *EToll, supra*, the Superior Court noted that the gist of the action doctrine bars fraud claims as well as negligence claims.

In this case, it is clear that the claims of fraudulent misrepresentation, negligent misrepresentation, and negligence all arise directly out of the contract dispute. Any alleged misrepresentations concerning the condition or quality of the stucco, insulation, gutters and the like are deeply intertwined with the obligations imposed by the parties' contract, and are not collateral thereto. *See Factory Mkt. v. Schuller Int'l.*, 987 F. Supp. 387 (E.D. Pa. 1998) (a case involving repairs to a roof).

Count VII, for negligence against Marc and Susan Pevar, is grounded on a "breach of duty" occurring when "Marc Pevar concealed his knowledge of water leakage on the disclosure statement." (Complaint, ¶95.) Accordingly, this count must fail as well.

Count IV, for breach of contract, is on surer footing. Construction defect claims are typically premised upon the theory of breach of contract, the elements of which are well known: (1) proof of the existence of a contract, (2) a breach of a duty owed under the contract, and (3) resultant damages. *Hart v. Arnold, supra*. In this case, the complaint complains that the addendum to the agreement of sale contained a list of items that Pevar agreed to complete prior to closing and did not, forcing the plaintiff to complete repairs at his expense. (Complaint, ¶¶79-82.)

From the evidence adduced at trial, including the testimony of Mr. Stoltzfus and the plaintiff himself, it is clear that the seller did complete the items specified under the addendum 8.1-8.3. Mr. Stoltzfus completed 8.3 in mid-

August 2011, installing the kick out flashings in the areas specified in the Tillman report. He neglected to finish the stucco under the deck doors and caulk there, or to recaulk the basement window, until being called back two weeks after settlement. All items were completed by the first week of September 2011, at no cost to the plaintiff.

New leaks developed, and some new conditions previously unknown thus became manifest three and a half months later. These matters are controlled, if at all, by Count III for unfair trade practice, and/or Count V asserting the implied warranty of habitability.

When these new problems arose in December 2011, Geesaman discovered that the roof repairs Pevar had agreed to in the addendum and completed did not fix the problem as Pevar believed they would. In instructing TruWood how to undertake the roofing repairs, Pevar attempted to remedy the leaky condition; he did not engage in any deceptive repair or make repairs that were not of the nature or quality of that set forth in the addendum. Pevar believed that the repairs had succeeded. The addendum was not a guarantee or warranty by Pevar, but merely a part of the agreement of sale to take certain action. Although not amounting to an UTPCPL violation, the repairs failed to solve the roofing problems and so the court, crediting the trial testimony on that point, finds that Pevar materially breached his agreement, entitling Kiselak to damages in the amount of the cost of repairs.

That cost is subsumed, however, in the rather greater amount Kiselak expended for additional roofing repairs occasioned by the newly discovered leaks and accompanying areas of defect. These are the proper subject of Kiselak's claim of breach of the implied warranty of habitability, which is Count V of his complaint.

Pennsylvania recognizes an implied warranty of habitability for residential construction. *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1972). This warranty is not created by any representation made by the builder-vendor, but rather is implied in law and as such exists independently of any representations of a builder-vendor. *Tyus v. Resta*, 476 A.2d 427, 433 (Pa. Super. 1984). The implied warranty of habitability arises when a contract to build or sell residential construction is executed by the parties. *Ecksel v. Orleans Const. Co.*, 519 A.2d 1021, 1026 (Pa. Super. 1987). The builder-vendor impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and is fit for the purpose intended — habitation. *Elderkin, supra*, at 128, 777.

Even if the stucco arguably was correctly applied, that fact would not relieve Pevar from liability for breach of the implied warranty of habitability if the roof still leaked anyway. In *Fetzer v. Vishneski*, 582 A.2d 23 (Pa. Super. 1990), the skylights in a new home began to leak. The dispute was whether they had been installed correctly. Plaintiff's expert contended that the only way to stop the leaking would be to replace the skylights altogether. The Superior Court cogently observed:

> "...Even if the trial court had found that appellant had properly installed the windows, that fact would not relieve appellant from liability for breach of the implied warranty of habitability if the windows unequivocally leaked. The leakage itself is sufficient to breach the implied warranty of habitability." *Id.* at 222, 25-26.

The seriousness of the several leaks in the roof is sufficient in this case to breach the implied warranty of habitability. Over 100 photographs were introduced into evidence showing how the substrate underneath the

stucco had gotten wet and began to rot, resulting in mold in certain places and requiring extensive restoration work at a number of different levels of the wall. Stucco had to be patched and various flashings had to be retrofitted and installed to stop the water intrusion. *Cf., Ecksel v. Orleans Const. Co., supra* (leaky basement breaches the warranty of habitability), *Tyus v. Resta, supra* (leaky crawlspace breaches the warranty of habitability).

The defendant points out that Kiselak and his family have now resided in the property for over three years, so it is obviously habitable. However, this court follows others in recognizing that the warranty of habitability is not to be so strictly construed as to require the dwelling to be deemed unlivable. It is sufficient if the court concludes that the defect presented a major impediment to habitation. *See Krugh v. Laurich*, 17 D. & C.4th 666 (1991), citing *Gallagher v. White Rock, Inc.*, 21 D. & C.3d. 106 (1981). This court so concludes.

Defendant contends that the plaintiff waived the warranty of habitability. In addition to the term set forth in the agreement of sale at paragraph 21(B), which is part of the pre-printed form, there is language typed into this agreement between the parties that the property is being sold "in as-is condition" and "without warranty". However, this court is bound by the decision of the Superior Court in *Tyus v. Resta, supra,* which states that given the important consumer protection afforded by implied warranties, such warranties may be limited or discharged only by clear and unambiguous language in written contract between the builder-vendor and the home purchaser. *Id.* at 20, 432. To create clear and unambiguous language of disclaimer, the *Tyus* court stated that the parties' contract must contain language which is both understandable and sufficiently *particular* to provide the new home purchaser adequate

notice of the implied warranty protections that he is waiving by signing the contract, referring to its effect on specially designated, potential latent defects. *Id.* at 21, 432 (emphasis in the original).

A moment's reflection suffices to show that neither clause in the agreement of Sale is sufficient under the foregoing principles to effect a waiver of the implied warranty of habitability in this case. Defendant Pevar breached this implied warranty. Plaintiff is entitled to the cost of repairs occasioned by that breach.

Plaintiff has made claim in Count III for violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). This is Pennsylvania's consumer protection law which seeks to prevent "[u]fair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce..." 73 P.S. §201-3. The protection provided by the UTPCPL applies to residential real estate transactions. *Growall v. Maietta*, 931 A.2d 667, 676 (Pa. Super. 2007), *appeal denied*, 597 Pa. 717, 951 A.2d 1164 (2008).

The purpose of the UTPCPL is to protect the public from unfair or deceptive business practices. *Agliori v. Met. Life Ins. Co.*, 879 A.2d 315, 318 (Pa. Super. 2005). The UPTCPL provides a private right of action for anyone who "suffers any ascertainable loss of money or property" as a result of an unlawful method, act or practice. 73 P.S. §201-9.2(a). Upon a finding of liability, the court has the discretion to award "up to three times the actual damages sustained" and provide any additional relief the court deems proper. *Id.* Section 201-2(4) lists twenty enumerated practices which constitute actionable "unfair methods of competition" or "unfair or deceptive acts or practices." 73 P.S. §201-2(4)(i)-(xx). Although the UTPCPL details a

number of practices which constitute actionable conduct, plaintiff's complaint fails to specify which provision of the UTPCPL defendants are alleged to have violated or what specific conduct was actionable. (Complaint, at ¶¶67-74.) The court is thus forced to interpret the above paragraphs of the complaint to determine which claims are being asserted and whether such claims, as pled, have been proven.

Count III of the Complaint begins with a recitation of the general requirements for a private action under the UTPCPL, namely that a defendant engage in "unfair or deceptive acts or practices" in the conduct "of trade or commerce" (§201-3, 9.2). The complaint then provides the statutory definition of trade or commerce as set forth in §201-2(3). The complaint at ¶70 then sets forth the elements required for a violation of the UTPCPL as asserted in Count III, *i.e.* the elements of common law fraud.

The complaint then states that "defendants'... *misrepresentations* as to stucco, roofing, plumbing, sewer and insulation problems constitute fraudulent or deceptive conduct within the meaning of the act (Complaint, at ¶71(emphasis added)). This allegation merely restates the requirements under §201-3 for a UTPCPL claim. It again does not identify which of the twenty enumerated "unfair or deceptive acts or practices" prohibited by the UTPCPL is alleged to have occurred in this case. At best, it can be read to allege a claim based upon a "misrepresentation." The "generality" of this allegation is highlighted by the very next paragraph which simply states that defendants engaged in trade and commerce. These two paragraphs combined merely lay out the general requirements for a UTPCPL claim; they offer nothing about which provision of the act defendants are alleged to have violated.

This leaves just two remaining allegations for the court related to the UTPCPL claim. First, that plaintiff "justifiably relied on the *misrepresentation* given by defendants...as to the stucco" (Complaint, at ¶73) (emphasis added) and plaintiff "suffered damages...as a result of justifiably relying on the defendants' *fraudulent statements* (Complaint, at ¶74 (emphasis added).) The complaint, therefore, can only reasonably be read to assert a claim under 73 P.S. §201-2(4)(xvii) which prohibits fraudulent conduct that creates a likelihood of confusion or of misunderstanding.

The pre-1996 catchall provision prohibited "fraudulent conduct" that created a likelihood of confusion or misunderstanding. 73 P.S. §201-2(4)(xvii). In 1996, the general assembly amended the UPTCPL and revised Section 201-2(4)(xxi) to add "deceptive conduct" as a prohibited practice. *See* act of December 4, 1996, P.L. 906, No. 146, §1 (effective Feb. 2, 1997). The current catchall provision proscribes "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. §201-2(4)(xxi).

The legislature's inclusion of "deceptive" in 1996 signaled that either fraudulent or deceptive conduct would constitute a catchall violation. The amendment also implied that deceptive conduct is something different from fraudulent conduct. *See, CSC Enterprises, Inc., supra* (observing: "where words of later statute differ from those of a previous one on the same subject they presumably are intended to have a different construction"). *Bennett v. A.T. Masterpiece Homes at Broadsides, LLC*, 40 A.3d 145 (Pa. Super. 2012).

In order, however, for a plaintiff to recover under claims of fraudulent conduct pursuant to §201-2(4)(xvii),

there must exist reliance upon a deceptive trade practice and individual proof of ascertainable as a result of any conduct prohibited thereby. *Weinberg v. Sun Co., Inc.*, 565 Pa. 612, 777 A.2d 442 (2001). A plaintiff must therefore demonstrate that he detrimentally relied upon the deceptive practice of the defendant and that he suffered harm as a result of this reliance. *Toy v. Metropolitan Life*, 863 A.2d 1 (Pa. Super. 2004), also noting that his reliance must have been justifiable. Count III of the complaint makes clear that the deceptive practices complained of are "Marc and Susan Pevar's misrepresentations as to stucco, roofing... and insulation problems..." (Complaint, ¶71.)

The court finds that when Marc and Susan Pevar signed the disclosure statement and indicated that they had no knowledge of any prior water leakages, that statement was materially false, at least as to Marc Pevar. As related above, Marc Pevar knew at that time that, when the house was being constructed, the stucco and gutter system had leaked water, causing damage to the hardwood floor. Marc Pevar was convinced that the problem had resolved, but he failed to disclose the existence of the prior leakage. No evidence was presented that Susan Pevar had any knowledge of whatever concerning prior water leakage.

On the other hand, it cannot be said that Kiselak placed any reliance on that statement when, by virtue of two different inspection reports in hand, he was apprised of prior water leakage with a great number of details about possible contributing conditions. Armed with that knowledge when he proceeded, he cannot be heard to say that he relied at all on the sellers disclosure statement, and therefore on such deceptive trade practice.

Even if one reads the complaint to assert a claim for fraudulent or "deceptive conduct," the result would be the

same. The evidence does not support a finding that any of the deceptive conduct alleged in Count III of plaintiff's complaint could have "created a likelihood of confusion or misunderstanding" as required for actionable conduct. For the same reasons that the claim fails under a "fraud" standard, it fails here. Upon receipt of the inspections reports, plaintiff was made aware of what problems and difficulties he was facing with this house. Regardless of the statement by defendants, there was no confusion or misunderstanding as to the condition of this property.

The other misrepresentation complained of at trial was the statement that the garage walls were insulated, when in fact they were not. The court finds that from the testimony of Marc Pevar this was an honest mistake, from a lapse of memory. In any event, the plaintiff failed to provide "proof of ascertainable loss" such as the cost to tear down the sheetrock and install the missing insulation, as a consequence of which the court has determined that Kiselak's claim for statutory violation is not proven.

Defendants contend that, by not agreeing to use Pevar's subcontractors, including Tru Wood Exteriors, the plaintiff has failed to mitigate his damages. Of course, a party injured by a breach of contract is under a duty to mitigate the damages. *Toyota Indus. Trucks USA, Inc. v. Citizens Nat'l Bank of Evans City*, 611 F.2d 465 (3d. Cir. 1979). This duty has been interpreted to mean those damages that the plaintiff might have avoided with reasonable effort, without undue risk, expense, or humiliation. *Id.* Thus, when a building contractor has neglected to perform the contract in every respect, it was the owner's duty to mitigate the damages resulting from the unfinished work that the contractor failed to perform. *Gaylord Builders, Inc. v. Richmond Metal Mfg. Corp.*, 140 A.2d 358 (Pa. Super. 1958). Defendants have not, however, cited the court to any

authority that the owner must avail himself of the seller's subcontractors, particularly when the owner is informed that the subcontractor's work was faulty and improper, as was the case here.[1] Moreover, the underlying premise of the defendants' argument, that the subcontractor would have performed the work more cheaply, was not proven to be the case. When Mr. Kiselak bid out the additional roofing work, the estimate of Tru Wood Exteriors was over $1,000 more than that of Geesaman. The court can find no failure on Mr. Kiselak's part to mitigate his damages.

The defendants also contend that the plaintiff did not prove that Geesaman's repair bills were reasonable. It is true that the plaintiff has the burden of proving the elements of his case, including the reasonableness of repairs. In this case, the amount of damages is relatively modest, and as already been pointed out, the Geesaman charges were less than the sellers' own subcontractors. The court believes this is an appropriate case to follow the holding in *Fetzer v. Vishnesky*, 582 A.2d 23 (Pa. Super. 1990), which states that once the homeowner has presented evidence as to the cost of remedying the defects, the amount paid by the owner may be presumed to be reasonable, subject to rebuttal evidence by the defendant. Where the defendant failed, as here, to rebut such evidence as to the cost of repairs, or the diminution in market value, the trial court may correctly award the owner the cost of repairs for the correction of the defective work that was done within a reasonable time after breach.

Finally, no count was addressed to the corporate

---

1. Certain authorities from other jurisdictions buttress this view. A plaintiff will not generally be obliged to accept the offer of repair by a contractor who was guilty of the breach that necessitated repair in the first place. *See, e.g., Mayfield v. Swafford*, 106 Ill App3d 610, 62 Ill Dec 155, 435 NE2d 953 (1982); *Barton v. Ellis*, 34 Ohio App3d 251, 518 NE2d 18 (1986).

defendant, The Pevar Company, so that judgment will be entered in its favor.

## CONCLUSIONS OF LAW

1. Counts for fraudulent and negligent misrepresentation and for negligence are barred by the "gist of the action" doctrine.

2. The absence of stucco behind the gutter was a latent defect unknown to the parties or their agents prior to settlement.

3. The implied warranty of habitability was not waived by terms in the agreement of Sale including "as is."

4. Because the roof repairs Pevar contracted to make were not successful, Pevar materially breached the contract.

5. Whether the repairs to the roof by seller's agent were proper or not, the roof still leaked; that condition violated the implied warranty of habitability in this case.

6. In denying knowledge of a prior water leak on the seller's property disclosure statement, Pevar's statement was materially false.

7. Plaintiff did not rely on that statement.

8. Plaintiff's evidence failed to establish a violation of the UTPCPL.

An appropriate order follows.

## ORDER

And now, this 2nd day of December, 2014, after trial by the court sitting without a jury on November 10-11, 2014, and in accordance with the foregoing decision, the court finds:

1. in favor of defendant, the Pevar Company, and against plaintiff, Mathew Kiselak, in no amount;

2. in favor of defendant Susan Pevar and against plaintiff, Mathew Kiselak, in no amount;

3. in favor of plaintiff, Mathew Kiselak, and against defendant, Marc Pevar, in the amount of $6,970.00, plus interest at the legal rate.