**In re M. PAOLELLA &
SONS, INC., Debtor.**

**Larry WASLOW, Trustee, Plaintiff,**

**v.**

**MNC COMMERCIAL CORP.
and Maryland National
Bank, Defendants.**

**The AMERICAN CIGAR COMPANY,
et al., Plaintiffs,**

**v.**

**MNC COMMERCIAL CORP., Maryland
National Bank and Larry Waslow,
Trustee, Defendants.**

Civ. A. Nos. 92–1405, 92–1532.
Bankruptcy No. 86–00495F.
Adv. Nos. 88–0232F, 87–1007F.

United States District Court,
E.D. Pennsylvania.

Nov. 18, 1993.

Arthur Newbold, Dechert, Price & Rhoads, Philadelphia, PA, for American Cigar Co., American Tobacco Co., Lorillard, Inc., Philip Morris, Inc. and R.J. Reynolds Tobacco Co.

William H. Ewing, Albert Bixler, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, PA, for Larry Waslow, Trustee for M. Paolella & Sons, Inc.

Richard M. Jordan, White and Williams, Philadelphia, PA, for MNC Credit Corp.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This is an appeal from the Bankruptcy Court's Final Judgment entered on February 3, 1992. The debtor's secured creditor, MNC Commercial Corp. ("MNC"), filed timely notice of appeal from this final judgment; this appeal was docketed as Civil Action No. 92–1405. MNC appeals the equitable subordination of its claim and the judgments as to reclamation entered against MNC and in favor of American Cigar Company, American Tobacco Company, Lorillard, Inc., Philip Morris, Inc., and R.J. Reynolds Tobacco Company (collectively referred to as "the tobacco company plaintiffs"). The Bankruptcy Court concluded that the tobacco company plaintiffs should be entitled to recover, under equitable subordination, the following amounts: American Tobacco—$59,-387.47; Lorillard—$374,636.00; Philip Morris—$820,700.51; and R.J. Reynolds—$681,-585.70. The Bankruptcy Judge also determined, however, that to award judgments in the same amount on both equitable subordination and reclamation would be to compensate the plaintiffs twice for the same harm. Therefore, the Bankruptcy Judge concluded that the legal remedy should precede equitable relief. That is, the Bankruptcy Judge concluded that the tobacco companies were entitled to judgments on their reclamation claims and, if the equitable subordination award exceeded the judgment as to reclamation, the plaintiff could then recover the difference in equitable subordination. Thus, the Bankruptcy Court entered judgments against MNC and for the tobacco company plaintiffs on their reclamation claims as follows: American Tobacco—$59,387.47; Lorillard—$374,636.00; Philip Morris—$619,-589.40; and R.J. Reynolds—$537,764.80. The Bankruptcy Court determined that, as to R.J. Reynolds and Philip Morris, the judgments as to equitable subordination exceeded the judgments awarded as to their reclamation claims. Therefore, the Bankruptcy Court entered judgments for these two plaintiffs as to their equitable subordination claims in excess of the reclamation claims as

follows: Philip Morris—$201,111.11; and R.J. Reynolds—$143,820.90.

The trustee in bankruptcy, Larry Waslow, also filed timely notice of appeal as to the Bankruptcy Court's final judgment against MNC and in favor of the trustee in the amount of $166,103. The trustee's appeal was docketed as Civil Action No. 92–1532. The trustee contends that the judgment in his favor should have been $2,655,488.

This Court has jurisdiction to hear these consolidated appeals, 92–1405 and 92–1532, pursuant to 28 U.S.C. § 158.

## I. STANDARD OF REVIEW

■■■ The district court's review of questions of law in a bankruptcy appeal is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98 (3d Cir.1981). However, findings of fact of the bankruptcy court will not be set aside unless "clearly erroneous." Bankruptcy R. 8013; *Decatur Contracting v. Belin, Belin & Naddeo*, 898 F.2d 339 (3d Cir.1990). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 393–94, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Upon a determination that the Bankruptcy Court's factual findings are not clearly erroneous, the district court must examine whether the factual findings are legally sufficient to support the bankruptcy court's conclusions of law. *See Universal Minerals*, 669 F.2d at 102.

## II. FINDINGS OF FACT BY THE BANKRUPTCY COURT

Since this Court has determined that the findings made by the Bankruptcy Court are not "clearly erroneous," we summarize the relevant facts as found by the Bankruptcy Judge as follows:

The debtor, M. Paolella & Sons, Inc., was the largest wholesale distributor of tobacco products in the Delaware Valley. On January 26, 1982, the debtor and MNC entered into a financing agreement that provided a line of credit secured by virtually all of the debtor's assets, *i.e.*, receivables, inventory, and equipment. These security interests were perfected by filings pursuant to the Uniform Commercial Code ("UCC"). Initially of two-year duration, the agreement was renewed and was in effect up to January 26, 1986. The financing agreement was asset-based in that it provided the debtor with a line of credit determined by a formula whereby the debtor could borrow against 85% of eligible accounts receivable and 60% of eligible inventory.

In October 1982, the debtor requested and MNC permitted an increase in credit to enable the debtor to participate in a special buying program offered by the tobacco companies. Thereafter, the debtor's loan was always out of formula. That is, after October 1982, the amount advanced by MNC always exceeded the sum of 85% of eligible receivables plus 60% of eligible inventory. Although MNC attempted repeatedly to bring the loan within formula, MNC agreed on several occasions to increase the amount of the overadvance to enable the debtor to participate in the tobacco companies' special buying programs; the debtor participated in these programs regularly.

As a consequence of the loan being out of formula, MNC, pursuant to the financing agreement, exercised considerable control of the debtor's business operations. Each business day the debtor would submit a report disclosing daily information as to receivables and weekly data as to the inventory. In addition, the debtor submitted weekly reports denoting invoices received. The financing agreement also gave MNC reasonable access to the debtor's premises during regular business hours and at other reasonable times, in order to conduct audits of its collateral. Pursuant to the agreement, MNC conducted frequent audits of the debtor's operations. MNC used all of this information to calculate the value of its collateral, the daily loan balance, and the additional loan sums then available to the debtor. All of these computations also included information from the debtor's tobacco distributor subsidiaries, Jersey Coast Tobacco & Candy ("Jersey Coast") and William B. Merrey and Sons, Inc. ("Merrey"). Typically, Michael Paolella, the debtor's president, or another Paolella

employee, would phone MNC on the morning of each business day and speak with MNC's vice-president of operations, Stephen Cromwell. The parties would discuss (1) the amount of the checks written by the debtor that would be presented to the MNC subsidiary, Maryland National Bank, for payment that day, and (2) the funds that MNC would make available to the debtor's account to honor those checks. The debtor's sole operating cash was located in Maryland National Bank whereas all receivables proceeds were placed in an account controlled by MNC and located at Continental Bank. By agreement between MNC and the debtor, funds to cover the checks were placed in the Maryland National Bank account twenty-four hours after the checks were presented. All monies with respect to Merrey and Jersey Coast were handled through these same accounts, and the loan and advances were all computed including the two subsidiaries. The financing agreement gave MNC the right to demand immediate repayment of the overadvance and, if not repaid, declare the loan in default. MNC also had the right to refuse to advance additional loan funds or make available to the debtor the proceeds of its receivables.

The debtor received inventory from different tobacco companies on a daily basis and was given twelve-fifteen days to pay the invoice (except for American Cigar, which allowed thirty days for payment). Periodically, tobacco suppliers would offer special buying programs in advance of price increases and would allow the debtor to: (1) purchase at pre-increase price; (2) take additional time to pay; or (3) purchase in greater quantities than usual. The debtor usually participated in these programs and so informed MNC.

By the early part of 1984, MNC became concerned about the debtor's ability to repay its loan. At this time, MNC classified the loan in the "watch" category and further reduced the classification to "substandard" by October 1985. In late 1985, Robert Stewart, MNC president, assumed final decision-making authority as to the loan previously overseen by Cromwell and Stewart and Cromwell consulted daily with Stewart regarding the loan. Moreover, as of August 19, 1985 the credit committee, which had previously reviewed the loan, ceased to do so and Stewart and Cromwell assumed this function.

In May 1985, the debtor and MNC discussed plans to liquidate debtor's assets and repay all of the debtor's creditors. Robert Stewart was aware of the liquidation plan, which was expected to be complete within three-five months with a "target date" of January 1, 1986. A condition of the plan was the debtor's reduction of the overadvance by $50,000 per week.

In September 1985, the debtor started to sell its assets. In a sale financed by MNC, Merrey was sold to Thomas J. Kline, Inc. ("Kline") in December, and MNC credited the debtor's account by $1,733,800. In addition, the debtor took back a note from Kline and assigned the note to MNC; MNC did not credit the face amount of the note, $350,000, to the debtor. On December 29, 1985, the debtor's stock in Jersey Coast was sold in a transaction financed by MNC, and the debtor's account was credited $1,483,500. The debtor also took back two notes totaling $212,000 from the buyer and assigned these to MNC. It is unclear from the record whether MNC received any payments on these notes; the Jersey Coast notes also were not credited to the debtor's account.

In the latter part of 1985, MNC decided to inventory the debtor's goods and sent Mr. Baldwin, MNC executive vice-president, to physically count all tobacco products. Previous audits had been performed by MNC's audit manager, Rick Sell, and only samples were counted. Mr. Baldwin conducted three audits in the early-morning hours of January 8, 15, and 21, 1986. The inventories were conducted while the debtor was closed for business, and there was no one in the warehouse except the audit team and the debtor's representative. In addition, unaware of the Baldwin audits, Mr. Sell conducted a regular audit during the debtor's business hours on or about January 28, 1986.

In expectation of an orderly liquidation, Michael Paolella began informing certain tobacco companies that he would not be renewing personal loan guarantees. He did not

inform these companies, however, of his liquidation plans.

American Tobacco had previously obtained a letter of credit in the amount of $120,000 from the debtor secured by Maryland National Bank. The letter allowed American Tobacco to draw upon the letter if payment from the debtor was more than thirty days overdue. The letter required that American Tobacco be given thirty days notice if the letter was to be canceled or not renewed. On January 3, 1986, twenty-two days before the deadline for notification, Maryland National Bank sent notice to American Tobacco that the letter of credit would not be renewed on its expiration date of February 24, 1986. As a result of the cancellation, the letter of credit covered invoices up to January 24, 1986 since only these would be thirty days overdue on or before February 24. However, because American Tobacco's credit terms gave the debtor twelve days to make payment on invoices, the letter of credit actually covered invoices sent up to January 12, 1986, since only these would be overdue by January 24, 1986. January 12, 1986 was a Sunday, and the debtor did not order inventory on weekends; therefore, the last invoice to be covered by the letter of credit was dated January 10, 1986.

American Tobacco was aware that the letter of credit would not be renewed by January 9, 1986, when its employee, Frank Gallagher, contacted Michael Paolella regarding the notice of non-renewal. Gallagher wanted to ascertain whether the decision not to renew had been made by the debtor or by the bank. Gallagher was not entirely satisfied with Paolella's explanation that the non-renewal was the debtor's decision. Accordingly, he called Maryland National Bank and was referred to Cromwell at MNC. Gallagher called Cromwell on Wednesday, January 15, 1986, and Cromwell confirmed that the decision not to renew the letter of credit was the debtor's. It appears, however, that the decision not to renew the letter of credit was MNC's. In the interim, American Tobacco, despite Gallagher's dissatisfaction with Michael Paolella's explanation regarding the letter of credit, continued to sell tobacco inventory to the debtor after January 10, 1986 and during the period when the letter of credit had expired.

In December 1985, the tobacco companies announced future price increases and special buying programs at pre-increase prices as follows: Philip Morris—150% of average weekly purchases at pre-increase price; R.J. Reynolds—225% of normal weekly purchases at pre-increase price; and Lorillard—100% of two average weekly purchases at the pre-increase price. The debtor took full advantage of these programs after notifying MNC of its desire to do so. The effect of these programs was to increase the debtor's tobacco inventory from mid-December 1985 through early January 1986 with payments due sometime in late January. MNC knew of these transactions and inventory buildup as a result of the financial information it received from the debtor.

American Cigar and American Tobacco did not have special programs nor did they provide any additional inventory to the debtor. However, the other tobacco companies extended credit above the average weekly amount. The debtor typically purchased $70,000 daily from Philip Morris and had twelve days to repay. Philip Morris was owed $1,712,608.13 as of January 31, 1986—the day the tobacco companies filed the involuntary bankruptcy petition. As a result of the special buying program, Philip Morris provided $820,700.51 in above normal credit to the debtor. Reynolds was owed $1,181,-585.70 on January 31, 1986 and typically sold $50,000 of tobacco products daily with fourteen days to pay. Therefore, the above normal credit provided by this creditor due to the special buying program was $681,585.70. The debtor normally purchased approximately $35,000 per day from Lorillard with fifteen days to pay; on January 31, 1986, the debtor owed Lorillard $759,636.00. The portion of the debt attributed to the special buying program was $374,636.00.

On December 31, 1985, the debtor's union contract expired although the parties continued to negotiate. On Friday, January 24, 1986, on the advice of labor counsel, Michael Paolella sent a letter to the union stating his plan to liquidate and cease operations as soon as possible. On that same date, Paolella

called Cromwell and informed him that one or more large checks issued by the debtor to pay for inventory would be presented for payment on Monday, January 27, 1986. Cromwell informed Paolella that he was unsure whether MNC would advance funds to honor the checks, and he stated that he would inform Paolella of the bank's decision on Monday. On Monday, January 27, 1986, Paolella informed Cromwell for the first time about the letter that he had sent to the union the previous Friday; also, Paolella inquired about the bank's decision regarding the checks.

On Tuesday, January 28, 1986, MNC decided not to advance the funds to honor the debtor's checks presented the previous day; Paolella was informed of this decision on Wednesday, January 29, 1986. Paolella told Cromwell that MNC should take over and operate the debtor. On Thursday, January 30, 1986, MNC notified the debtor that the loan was in default and requested immediate repayment of the entire balance and possession of all collateral securing the loan. In addition, Rick Sell, MNC's audit manager, took possession of the debtor's assets and secured the warehouse. MNC president Stewart testified that the decision to cease funding was motivated by the union letter and fear of a violent strike.

Also on January 30, 1986, credit collection managers from several tobacco companies came to the debtor's business in Philadelphia after their companies learned that the debtor's checks had been dishonored by Maryland National Bank. On Friday, January 31, 1986, despite entreaties by Paolella that the debtor be given until Monday, February 3, 1986 to liquidate its assets, the tobacco company plaintiffs filed an involuntary bankruptcy petition against the debtor. Larry Waslow was appointed Chapter 7 trustee on February 6, 1986, and an order for relief was entered on April 13, 1986.

Upon sale of the debtor's assets, the trustee obtained $4,500,000.00 from the sale of inventory (estimated by the trustee to be 75% of the debtor's cost) and $3,000,000.00 in receivables collection (estimated by the trustee to be approximately 90% of face value). The debtor's equipment was liquidated for $125,277.00. On January 31, 1986, the date of the bankruptcy petition, the debtor owed MNC $11,218,252.00. As a result of the trustee's liquidation of the estate, MNC received a distribution totaling $6,606,678.37. On November 1, 1985, ninety days pre-petition, the debtor owed MNC approximately $14,520,067.00. The debtor's report on that date shows: receivables of $6,245,533.64 and inventory of $9,718,227.39, including receivables and inventory for Jersey Coast and Merrey subsidiaries. The inventory located by the Chapter 7 trustee was approximately one-third (approximately $3,000,000.00) less than the debtor's figure reported on its daily report to MNC dated January 31, 1986. There was no evidence presented that either the debtor or trustee had improperly converted the inventory.

The five tobacco Company plaintiffs filed proofs of claim as follows: American Cigar—$23,923.40; American Tobacco—$283,671.51; Lorillard—$759,636.04; Philip Morris—$1,712,608.13; and Reynolds—$1,181,585.70. The debtor was insolvent, *i.e.*, its debts exceeded its assets, during the ninety-day period preceding the filing of the bankruptcy petition on January 31, 1986. Each of the tobacco companies filed a written demand for reclamation of goods on the debtor within ten days of the involuntary petition. Due to the perishable nature of the goods, the tobacco companies, MNC, the debtor, and the trustee all agreed (1) to permit the trustee to sell the goods, and (2) that any reclamation claim would attach to the proceeds. The tobacco companies asserted reclamation claims as follows: American Cigar—$15,565.71; American Tobacco—$194,499.40; Lorillard—$445,-659.20; Philip Morris—$619,589.40; and Reynolds—$537,764.80.

## III. BANKRUPTCY COURT'S JURISDICTION

Defendant MNC argues that the Bankruptcy Court lacked jurisdiction to render final judgments as to plaintiffs' equitable subordination and reclamation counts. As a basis for this argument, MNC contends that the Bankruptcy Court erred in holding that these were "core" proceedings under the bankruptcy code. MNC asserts that these

are "non-core" proceedings and that the Bankruptcy Court therefore could not enter final judgments. In the alternative, MNC argues that if these are "core" proceedings, the Bankruptcy Court's jurisdiction to adjudicate these claims constitutes an impermissible grant of power to an Article I court proscribed by *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

■ In *Marathon*, the United States Supreme Court held that Congress' 1978 jurisdictional grant to non-Article III bankruptcy judges was unconstitutional on the ground that Congress impermissibly removed most, if not all, of the "essential attributes of the judicial power" from the Article III district court and vested them in a non-Article III adjunct, the bankruptcy court. Congress, responding to the decision in *Marathon*, enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law 98–353 ("1984 Act"). This legislation amended 28 U.S.C. § 1334 to provide in relevant part:

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a Court or courts other than the district courts, the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to a case under title 11.

. . . .

(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C. § 1334 (Supp.1993). As part of the 1984 Act, Congress also enacted 28 U.S.C. § 157, which states in pertinent part:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case shall be referred to the bankruptcy judges for the district.

28 U.S.C. § 157(a) (1993). Subsections (b) and (c) of section 157 divide cases heard by bankruptcy judges into "core" and "non-core" proceedings and define the relationship between the bankruptcy and district courts. Regarding "core" proceedings, section 157 provides:

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

*Id.* § 157(b)(1). Subsection 157(b)(2) consists, in relevant part, of the following non-exhaustive list of core proceedings arising under title 11:

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate . . .;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

*Id.* § 157(b)(2)(A), (B), (E), (F), (O). As to "non-core" proceedings, section 157 provides:

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

*Id.* § 157(c)(1). In contrast, the district court's standard of review as to final judg-

ments is set forth in 28 U.S.C. § 158, which provides in relevant part:

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title....

(c) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

*Id.* § 158(a) & (c). Rule 52(a) of the Federal Rules of Civil Procedure applies the "clearly erroneous" standard to appeals taken from the district courts to courts of appeals. Therefore, the clear implication of sections 157 and 158 and Fed.R.Civ.P. 52(a) is that Congress intended that the "clearly erroneous" standard of review be applied to the bankruptcy judge's findings of fact in appeals from final judgments such as those entered in "core" proceedings. *Accord Matter of Excalibur Auto. Corp.,* 859 F.2d 454, 457 n. 3 (7th Cir.1988); *In re Daniels–Head & Assocs.,* 819 F.2d 914, 918 (9th Cir.1987); *In re Osborne,* 42 B.R. 988, 993 (W.D.Wis.1984).

The interplay between the Bankruptcy Code's provisions as to "core" and "noncore" proceedings has been summarized as follows:

In noncore matters, the bankruptcy court acts as an adjunct to the district court, in a fashion similar to that of a magistrate or special master. In noncore matters, the bankruptcy court may not enter final judgments without the consent of the parties, and its findings of fact and conclusions of law in noncore matters are subject to de novo review by the district court.... In contrast to the bankruptcy court's authority in noncore cases, the bankruptcy court may enter final judgments in so-called core cases, which are appealable to the district court. The standard for appeal of core matters of the district court is the same as in other civil matters appealed from the district court to the circuits courts of appeal. 28 U.S.C. § 158(c).

*In re Castlerock Properties,* 781 F.2d 159, 161 (9th Cir.1986) (quoting *In re Production Steel, Inc.,* 48 B.R. 841, 844 (M.D.Tenn. 1985)). Thus, the cornerstone of the jurisdictional system provided by Congress in the 1984 Act is the distinction between "core" and "non-core" matters. *See id.* The limitation that bankruptcy courts may only adjudicate (1) cases under title 11, and (2) "core" matters arising under title 11 or (3) arising in a case under title 11 brought the Bankruptcy Code within the strictures set forth in *Marathon.* *Accord In re Daniels–Head,* 819 F.2d at 917–18; *In re Castlerock,* 781 F.2d at 161–61; *In re Osborne,* 42 B.R. at 993–94. Therefore, the critical inquiry for purposes of compliance with *Marathon* is whether equitable subordination and reclamation are "core" matters such that the Bankruptcy Court properly entered final judgments.

■ Equitable subordination is unquestionably a "core" proceeding pursuant to section 157(b)(2). The section expressly provides that "core" proceedings include all matters concerning the administration of the bankrupt estate, all orders to turn over property of the estate, and all other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship. Equitable subordination fits within all of these definitions. Moreover, the cases holding that equitable subordination is a "core" proceeding are legion. *See, e.g., In re Holywell Corp.,* 913 F.2d 873, 879 (11th Cir.1990) (reviewing the bankruptcy court's factual findings as to equitable subordination under "clearly erroneous" standard as required by 28 U.S.C. § 158(c) only for *final judgments and orders*); *In re Clark Pipe,* 893 F.2d 693 (5th Cir.1990) (same); *In re Auto Specialties Mfg. Co.,* 153 B.R. 457, 461 (Bankr. W.D.Mich.1993) (presenting an extensive list of cases holding that equitable subordination is a "core" proceeding under § 157); *accord In re F.A. Potts & Co., Inc.,* 115 B.R. 66, 71 (E.D.Pa.1990) (reviewing equitable subordination findings of fact by bankruptcy judge under "clearly erroneous" standard); *In re Beck Rumbaugh Assocs., Inc.,* 114 B.R. 418 (E.D.Pa.1990) (same); *In re Ludwig Honold*

*Mfg. Co.,* 46 B.R. 125 (Bankr.E.D.Pa.1985) (same).

■ Likewise, all courts that have considered the issue have determined that reclamation is also a "core" proceeding pursuant to section 157(b)(2). *See, e.g., In re Wheeling–Pittsburgh Steel Corp.,* 74 B.R. 656, 658 (Bankr.W.D.Pa.1987) (reclamation proceeding under Pennsylvania U.C.C. section 2702 and 11 U.S.C. § 546 is a "core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(O)"); *In re Continental Airlines, Inc.,* 125 B.R. 415, 416 (Bankr.D.Del.1991) (reclamation is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (E)). In conclusion, equitable subordination and reclamation are "core" proceedings under the Bankruptcy Code. Therefore, pursuant to section 157(b)(1), the Bankruptcy Court had the power to enter final judgments as to these proceedings, and this Court's review under the "clearly erroneous" standard clearly comports with the principles set forth in *Marathon.*

## IV. EQUITABLE SUBORDINATION

It is a long-standing principle that bankruptcy courts, sitting as courts of equity, have the authority to subordinate claims on equitable grounds. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 306–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939) (holding that bankruptcy courts have the equitable power "to sift the circumstances surrounding any claim to see that injustice is not done in the administration of the bankrupt estate"). Nevertheless, equitable subordination is an extraordinary departure from the "usual principles of equality of distribution and preference for secured creditors." *In re Osborne,* 42 B.R. at 992.

■ Section 510(c) of the Bankruptcy Code codified pre-existing case law allowing bankruptcy courts to adjust the status of claims on equitable grounds. *See In re CTS Truss, Inc.,* 868 F.2d 146, 148 (5th Cir.1989) (Congress' intent in drafting § 510 was to "incorporate doctrines that had been well-developed in the courts for several decades preceding the enactment of the Bankruptcy Code"); *see also In re Burden,* 917 F.2d 115 (3d Cir.1990); *In re Virtual Network Servs.*

*Corp.,* 902 F.2d 1246 (7th Cir.1990); *In re Clark Pipe,* 893 F.2d 693 (5th Cir.1990), *withdrawing* 870 F.2d 1022 (5th Cir.1989); 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 510.05 (15th ed. 1988). Section 510(c) states in relevant part:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

Because of Congress' clear intent that section 510 codify then-existing principles of equitable subordination, most courts applying the doctrine have adopted the three-prong test articulated by the United States Court of Appeals for the Fifth Circuit on the eve of the Bankruptcy Code's enactment:

> (i) The claimant must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977) (citations omitted); *see, e.g., In re Missionary Baptist Found.,* 818 F.2d 1135, 1143 (5th Cir.1987) ("This formula was not a novel statement but rather, was arrived at through a 'distillation of case law.'") (quoting *Collier's* ¶ 510.05[2], at 510–9); *accord In re Beck Rumbaugh Assocs., Inc.,* 114 B.R. 418 (E.D.Pa.1990); *In re F.A. Potts & Co., Inc.,* 115 B.R. 66 (E.D.Pa.1990).

■ Although there is general acceptance of the *Mobile Steel* three-part test, courts have struggled to define the precise conduct that constitutes grounds for equitable subordination. Generally, there are three catego-

ries of conduct that satisfy the first prong of the three-part test: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. *Clark Pipe*, 893 F.2d at 699, *citing In re Missionary Baptist Found.*, 712 F.2d 206 (5th Cir.1983); *see also In re Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir.1993); *In re CTS Truss, Inc.*, 868 F.2d at 148–49.

Further, in applying equitable subordination principles, the courts differentiate between insider and non-insider claimants. As stated in *In re Teltronics Servs., Inc.*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983):

> The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors.

In *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986), the court discussed the differences in the burden of proof in insider and non-insider cases:

> The burden and sufficiency of proof required are not uniform in all cases. Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated. If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoliation or overreaching, and prove it with particularity.

(citations omitted). *Accord In re Osborne*, 42 B.R. at 996 ("Once an objectant in an insider case supports allegations of impropriety with a substantial factual showing, the burden shifts to the insider creditor to prove the good faith and inherent fairness of its actions. However, the burden remains on the objectant in cases involving non-insider creditors."); *Mobile Steel*, 563 F.2d at 701–02 (same).

Whether a claimant is an insider is a question of fact and subject to review under the "clearly erroneous" standard. *See In re Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir.1993) (citing *In re Fabricators*, 926 F.2d 1458, 1466 (5th Cir.1991)). Although "insider" is defined by the Bankruptcy Code at 11 U.S.C. § 101(31), courts applying the doctrine of equitable subordination look beyond the statutory definition and examine whether the party has attained fiduciary status by exercising control of the debtor. *See* Lawrence P. King, *Collier on Bankruptcy* ¶ 510.05 (15th ed. 1988); *In re EMB Associates, Inc.*, 92 B.R. 9, 15–16 (Bankr.D.R.I. 1988) (suggesting that the term "insider" under 11 U.S.C. § 101(30) is merely illustrative and "must be applied flexibly on a case by case basis") (quoting *In re Huizar*, 71 B.R. 826, 831 (Bankr.W.D.Tex.1987)). Thus, courts have found that control over the debtor may render non-insiders "fiduciaries" for purposes of equitable subordination; however, such control must be "virtually complete." *In re Osborne*, 42 B.R. at 997. In *Teltronics*, the court summarized the "control" required to find that a creditor is a fiduciary of the debtor:

> The cases cited above strongly suggest that a non-insider creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become the alter ego of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace.

*Teltronics*, 29 B.R. at 171 (citing *Rader v. Boyd*, 252 F.2d 585, 587 (10th Cir.1958)); *see also In re American Lumber*, 5 B.R. 470 (D.Minn.1980) (finding control rendered creditor bank a fiduciary where the bank terminated debtor's employees and substituted them with its own staff to run the debtor's business).

In this case, the Bankruptcy Judge found that MNC did not participate in the debtor's management, determine its operating decisions, or have any presence on its board. It was Michael Paolella who controlled the debtor, who decided that the debtor would participate in tobacco company purchase programs, and who decided that the debtor would expand and then later liquidate.

We agree with the Bankruptcy Court's finding that MNC is neither an insider nor a fiduciary of the debtor. Thus, it is clear that the burden of proof is on the tobacco company plaintiffs to establish that they are entitled to equitably subordinate MNC's claim.

Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries. As Judge Easterbrook pointed out in *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1356 (7th Cir.1990), "[c]ases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." The dearth of cases subordinating the claims of non-insiders is readily explained by the high threshold of misconduct that must be established by the objectant in non-insider cases. In *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis.1984), the court discussed the conduct required for equitable subordination in non-insider cases:

> [The degree of misconduct] has been variously described as "very substantial" misconduct involving "moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage" or as gross misconduct amounting to fraud, overreaching or spoliation.

*Accord In re Mayo*, 112 B.R. 607, 650 (Bankr.D.Vt.1990) ("There are few cases in which gross misconduct has actually been applied to non-insiders, and even fewer where inequitable misconduct has caused a claim to be subordinated."); *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 938 (D.Colo.1990) (noting that "when [the fiduciary] relationship is absent, the party seeking equitable subordination of a claim must demonstrate even more egregious conduct by the creditor"). Although courts have struggled to articulate the misconduct that must be established to subordinate non-insider claims, it is clear that the non-insider's misconduct must be "gross or egregious." *See* Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law Manual* ¶ 5.15 at 5–96 (3d ed. 1992); *see also In re Osborne*, 42 B.R. at 997 (stating that "plaintiffs are required to make a showing of gross or egregious misconduct"). Thus, "[a] mere statement that the creditor is guilty of 'inequitable conduct' will not suffice." *In re W.T. Grant*, 4 B.R. 53, 75–76 (Bankr.S.D.N.Y.1980), *aff'd*, 699 F.2d 599 (2d Cir.1983). Rather, the plaintiff must prove gross misconduct tantamount to "fraud, overreaching or spoliation." *Id.; see also In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991) ("If a claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary."); *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 938 (D.Colo.1990) ("The degree of misconduct which the plaintiff must show in the case of a noninsider has been variously described as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation."); *In re Teltronics*, 29 B.R. at 173 (holding that "it is incumbent upon the [objectant] to demonstrate that [the non-insider] engaged in very substantial misconduct tantamount to fraud, overreaching or spoliation, which caused other creditors of [the debtor] to suffer damages"); *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 488 (Bankr.N.D.Ohio 1988) ("Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealings; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others."). In summary, the "gross or egregious misconduct" needed to subordinate claims of non-insiders is much greater than the "inequitable conduct" that warrants subordination of insiders and fiduciaries.

## V. THE BANKRUPTCY COURT'S CONCLUSIONS OF LAW REGARDING EQUITABLE SUBORDINATION

The Bankruptcy Court entered judgments against MNC and for the tobacco company plaintiffs on the basis of equitable subordination in the following amounts: Philip Morris—$201,111.11; and R.J. Reynolds—$143,820.90. The basis for the court's decision was that MNC engaged in two types of inequitable conduct. First, the Bankruptcy Court determined that MNC's conduct was inequitable in that it embarked on a policy to garner additional information so as to exercise its contractual rights not to lend at a propitious time relative to tobacco company

creditors. The court found that in order to effectuate this policy MNC altered 1) its method of dealing with the debtor, 2) its method of obtaining information, and 3) the type of information it obtained from the debtor. Second, the court found that MNC misled the debtor and others as to the existence of its intent not to renew the letter of credit. More specifically, the Bankruptcy Judge determined that MNC misrepresented the reason for the nonrenewal of the letter of credit. The conduct in these two instances, however, clearly does not rise to the level of gross or egregious misconduct tantamount to fraud, overreaching or spoliation, which is needed to equitably subordinate the claim of a non-insider.

Generally, a creditor does not act inequitably in exercising its contractual rights. Judge Easterbrook, writing for the Seventh Circuit Court of Appeals, stated: "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for their lack of 'good faith.'" *Kham & Nate's Shoes,* 908 F.2d at 1357. "There is no doubt that ... the banks kept careful watch on what was going on at Grant; they would have been derelict in their duty to their own creditors and stockholders if they had not." *W.T. Grant,* 699 F.2d at 610 (Friendly, J.). In *In re Clark Pipe & Supply Co.,* 893 F.2d 693, 700 (5th Cir.1990), the Fifth Circuit Court of Appeals held that there was no subordination where there was no evidence that the creditor "exceeded its authority under the loan agreement or that [the creditor] acted inequitably in exercising its rights under that agreement." Our attention has not been called to any case wherein a court has equitably subordinated the claim of a non-insider who adhered to the terms of a loan agreement.

The Bankruptcy Court in this case concluded that MNC acted within its contractual rights in monitoring the debtor's operations and in ceasing to advance funds because the loan was out of formula. The Bankruptcy Court determined, however, that MNC acted inequitably, not by exercising its rights under its financing agreement, but by

consciously embarking on a policy to garner additional information so as to exercise its contractual right not to lend at a propitious time for it relative to tobacco company creditors. This Court cannot conclude that such activities constitute inequitable conduct for purposes of the doctrine of equitable subordination.

It is well-established that a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim. *In re W.T. Grant,* 699 F.2d at 610; *In re W.T. Grant,* 4 B.R. 53, 75 (Bankr.S.D.N.Y.1980). As stated by the late Judge Friendly in *W.T. Grant,* "the banks wished 'to recoup the most amount of money as possible on the Grant loans,' an understandable and permissible desire." *W.T. Grant,* 699 F.2d at 609. For purposes of the doctrine of equitable subordination, it is not inequitable for a non-insider creditor to monitor a debtor closely, pursuant to a valid financing agreement, for the purpose of choosing the most advantageous time to foreclose on a loan that has been out of formula for several years. Not only is it not inequitable conduct, but MNC would have been derelict in its duty to its own stockholders and depositors, if it had failed to obtain additional information so as to exercise its contractual right not to lend at a propitious time relative to tobacco company creditors. This principle has even more force in cases such as this one, where the Bankruptcy Judge found that all creditors were aware of the debtor's precarious financial position. Accordingly, there was no reliance by any creditor that MNC would continue funding; nor was there an explicit or implicit promise by MNC to continue funding. Indeed, the Bankruptcy Judge found that the tobacco plaintiffs knew that the debtor was overleveraged and knew that there was a risk that MNC might declare the loan in default or refuse to advance additional loan funds or make available to the debtor the proceeds of its receivables. Yet, knowing for some time of the substantial risk of nonpayment of their outstanding invoices, these tobacco companies continued making unsecured loans to the debtor. Within this context, MNC's conduct hardly can be considered inequitable under the doctrine of eq-

uitable subordination. As discussed by the Fifth Circuit Court of Appeals in *In re Clark Pipe,* 870 F.2d 1022, 1024 (5th Cir.1989), *withdrawn by* 893 F.2d 693 (5th Cir.1990), it is not gross or egregious misconduct warranting equitable subordination of a lender's claim to monitor the debtor closely; to extend sufficient funds so as to improve the lender's position at the expense of the other creditors; and to refuse to supply further funds at a propitious moment on a loan that is in default. Banks are not "eleemosynary institution[s]" required to "throw good money after bad." *Kham & Nate's Shoes,* 908 F.2d at 1358 (Easterbrook, J.).

 The second type of inequitable misconduct cited by the Bankruptcy Judge was MNC's misrepresentation to American Tobacco that the letter of credit was not renewed at the debtor's request. MNC was under no duty, however, to disclose to other creditors the basis for its decision not to renew the letter of credit or to disclose Paolella's financial condition. In fact, if MNC had revealed its unwillingness to continue a lending relationship with the debtor—a decision reached on the basis of internal audits of the debtor—MNC may have been liable to the debtor for breach of confidentiality. In equitable subordination, there are no cases that go so far as to require a security holder to advise other creditors that it is discontinuing a letter of credit because its client is in poor financial condition.

 Furthermore, the law requires that the creditors seeking equitable subordination must show that the misrepresentation was relied upon to their detriment. Equitable subordination is appropriate only when the misconduct results in actual harm to the creditor. *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1363 (1st Cir.1992); *see also In re Osborne,* 42 B.R. at 997 ("The key factor would appear to be misrepresentations on which other creditors *relied to their detriment.*") (emphasis added). In this case, the tobacco company plaintiffs cannot demonstrate reasonable reliance. In fact, it defies the imagination that the tobacco companies would have furnished millions of dollars of tobacco products to the debtor in reliance on statements by MNC and the debtor to the effect that it was the debtor's decision not to renew the letter of credit. These companies were not misled into selling products to the debtor. As the record plainly shows, Michael Paolella stated to American Tobacco that he was trying to obtain alternative financing through another lender. Furthermore, there is no question that MNC gave ample notice to American Tobacco that it did not intend to renew the letter of credit. Regardless of whose decision it was to not renew the letter of credit, the letter of credit had expired and American Tobacco had been given ample notice of MNC's decision not to renew. Yet, in spite of the fact that it knew that there was no letter of credit to secure its interest, American Tobacco continued to ship products to the debtor. The record is devoid of any evidence that MNC ever assured, implicitly or otherwise, that American Tobacco would be paid by MNC or that MNC stood behind Paolella. On the contrary, by giving notice that the letter of credit would not extend past February 24, 1986, MNC explicitly told American Tobacco that the bank did *not* stand behind Paolella. Even the simplest of fraud cases teach that the complaining party must show reasonable reliance. In this case, there is no evidence from which the Court could determine that the tobacco company plaintiffs reasonably relied on MNC's telephone conversation regarding the letter of credit as a basis for furnishing products to the debtor. To the extent that the tobacco companies suffered harm in this case, it appears that such harm resulted from the companies' own lack of business judgment in continuing to sell to a debtor, whom they had reason to believe did not necessarily have the wherewithal to pay for the products.

It is of interest to note that the Bankruptcy Judge in his findings of fact found that one of the reasons given by MNC for foreclosing on the loan—a letter that the debtor sent to the union notifying it that it would not renew the union contract because it was going out of business—was a pretext. It should be emphasized, however, that MNC did not need a reason to foreclose on a loan that had been in default for years. The Bankruptcy Judge's findings of fact show that MNC knew that the debtor intended to

go out of business and that MNC had financed the sale of both of the debtor's subsidiaries. The union letter, while it may be a pretext, would appear to be irrelevant and clearly could not have been a basis for the tobacco companies proceeding to their detriment to deliver millions of dollars in tobacco products to the debtor.

■■■■■ In summary, equitable subordination is an extraordinary remedy, which is generally not invoked against a non-insider creditor unless a claimant can demonstrate that the creditor has engaged in gross or egregious misconduct tantamount to fraud, overreaching or spoliation. Secondly, the claimant seeking subordination must show detrimental reliance on the creditor's misconduct. In this case, the tobacco companies cannot satisfy either prong of the test. Consequently, the Bankruptcy Court's conclusions of law regarding equitable subordination must be reversed.

## VI. RECLAMATION UNDER THE UNIFORM COMMERCIAL CODE § 2702

The Bankruptcy Court entered judgment against MNC and for the tobacco company plaintiffs pursuant to 11 U.S.C. § 546(c) and the Uniform Commercial Code, 13 Pa.Cons. Stat.Ann. § 2702(b), in the following amounts: American Tobacco—$59,387.47; Lorillard—$374,636.00; Philip Morris— $619,589.40; and R.J. Reynolds—$537,764.80.

Section 546 of the Bankruptcy Code incorporates state law as follows:

(c) except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of business, to reclaim such goods if the debtor has received such goods while insolvent, but—

(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and

(2) the court may deny reclamation to a seller with such right of reclamation that has made such a demand only if the court—

(A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or

(B) secures such claim by a lien.

11 U.S.C. § 546(c). In this case, the five tobacco companies delivered reclamation notices to the debtor pursuant to the Uniform Commercial Code, 13 Pa.Cons.Stat.Ann. § 2702(b), which states in pertinent part that "[w]here seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt." However, section 2702(c) makes the seller's reclamation "subject to the rights of a buyer in ordinary course *or other good faith purchaser under this division (section 2403)*." *Id.* § 2702(c) (1984) (emphasis added).

In this case, the parties agree that the debtor received the goods while insolvent and that the tobacco companies made demand to reclaim within ten days after receipt of the goods. Thus, the only issue remaining is whether MNC is a "good faith purchaser" for purposes of section 2702(c).

Clearly, a holder of a perfected security interest in after-acquired inventory is a "good faith purchaser" under 13 Pa.Cons. Stat.Ann. § 2403. *See Lavonia Mfg. Co. v. Emery Corp.*, 52 B.R. 944, 946–47 (E.D.Pa. 1985) (citing *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City*, 611 F.2d 465 (3d Cir.1979)). The Bankruptcy Judge concluded as a matter of law, however, that MNC's conduct as discussed in Part V of this opinion was such that MNC was not entitled to be considered a "good faith purchaser" for purposes of reclamation. In reaching his conclusion, the judge reasoned that any inequitable conduct sufficient to form a basis for equitable subordination is also sufficient for a finding that the security holder is not entitled to be considered a "good faith purchaser" under section 2702. Inasmuch as we have determined that the conduct of MNC, the security holder, was not such that the tobacco companies were entitled to equitable subordination, it follows that

the Bankruptcy Judge's reasoning is not legally sufficient to support his conclusion of law in respect to section 2702. Furthermore, as a result of our analysis of the reclamation statute, this Court finds that MNC is a "good faith purchaser" under section 2702.

■ Under the UCC, "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." 13 Pa.Cons.Stat.Ann. § 1203 (1984). The reclamation provision, section 2702, defines "good faith" as: "Honesty in fact in the conduct or transaction concerned." *Id.* § 1201. In determining the meaning of "good faith" under Pennsylvania law, we predict that the Supreme Court of Pennsylvania would follow the reasoning of the Pennsylvania Superior Court as set forth in *Creeger Brick v. Mid–State Bank,* 385 Pa.Super. 30, 560 A.2d 151 (1989). The *Creeger* court pointed out that the definition of "good faith" as defined in section 1201 of the UCC is similar to the definition of "good faith" under section 205 of the Restatement (Second) of Contracts. *Id.* 560 A.2d at 154. The *Creeger* court also stated that "the Supreme Court of Pennsylvania has refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor" and concluded that:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself ... A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted.

*Id.* Similarly, Judge Easterbrook reasoned in *Kham & Nate's Shoes:*

Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of

"good faith." Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith— such as the UCC's § 1–201(19) ... fill the gap. They do not block use of terms that actually appear in the contract.

*Kham & Nate's Shoes,* 908 at 1357 (citations omitted). Thus, it is plain that under Pennsylvania law, a creditor that enforces a financing agreement in a manner consistent with the clear terms of the agreement and the expectations of the parties acts in "good faith."

■ In this case, the contract that must be examined to determine whether MNC acted in "good faith" is the financing agreement between MNC and the debtor. The Bankruptcy Judge found that MNC's overall plan, *i.e.,* to gather information without alerting the other creditors of its future plan to cease funding the debtor when the warehouse was full, constituted inequitable conduct that deprived MNC of its status as a "good faith purchaser" under section 2702(b). Notably, the Bankruptcy Judge did not find that any of these actions were outside the scope of the financing agreement. It is clear from the Bankruptcy Judge's exhaustive ninety-three page opinion that MNC did not overstep its rights under the financing agreement. To defeat MNC's security interest, the tobacco company plaintiffs must show that MNC violated the subjective "honesty in fact" standard of section 1201. The companies have failed to offer such evidence.

On the basis of the findings of the Bankruptcy Judge, this Court concludes that there is no reason to consider MNC as anything other than a "good faith purchaser" under section 2702(c). Therefore, as to reclamation this Court will reverse the Bankruptcy Court's judgments against MNC and in favor

of the tobacco company plaintiffs as follows: American Tobacco—$59,387.47; Lorillard—$374,636.00; Philip Morris—$619,589.40; and R.J. Reynolds—$537,764.80.

## VII. BANKRUPTCY CODE SECTION 547 PREFERENCE

The Bankruptcy Court entered judgment for the trustee and against MNC in the amount of $166,103 as a voidable preference under 11 U.S.C. § 547. The trustee contends that the Bankruptcy Court should have entered judgment in the amount of $2,655,488. For the reasons that follow, this Court will affirm the Bankruptcy Court's judgment regarding the section 547 voidable preference.

The policy behind section 547 of the Bankruptcy Code is that creditors of the debtor should not be able to improve their position during the ninety days immediately prior to the bankruptcy filing. Section 547 states in relevant part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition, if such creditor was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt by the provisions of this title.

11 U.S.C. § 547(b) (1988). The purpose underlying section 547 is two-fold. First, the rule ensures that similar creditors are similarly situated to receive distributions from the debtor's assets. Second, and more importantly, the policy stops the "race" to dismantle the debtor by requiring creditors who jump the gun to return to the starting line. *See generally* 4 Lawrence P. King, *Collier on Bankruptcy,* ¶ 547.01, at 547–11 & n. 8 (15th ed. 1990). Therefore, the Bankruptcy Code's preference provision within section 547 prevents, among other things, the premature demise of financially distressed debtors and unfair advantage-taking by insiders with superior knowledge of the debtor's financial condition.

The trustee bears the burden of persuasion as to the elements of section 547(b). *See* 11 U.S.C. § 547(g); *Decatur Contracting v. Belin, Belin & Naddeo,* 898 F.2d 339, 345 n. 5 (3d Cir.1990). Once the trustee has met its burden, a creditor may raise any or all of the five exceptions set forth in section 547(c); thus, not all transfers that appear at first blush to be preferential may be set aside by the trustee. The creditor bears the burden of persuasion as to the exceptions contained in subsection c. *See* 11 U.S.C. § 547(g).

Of course, a secured creditor in a Chapter 7 proceeding is entitled to receive its collateral or proceeds derived from its liquidation by the trustee. *Id.* §§ 363(f) & 725 (1993). Thus, as correctly pointed out by the Bankruptcy Judge in this case, there is no preference under section 547(b) if the creditor merely receives a pre-petition transfer of its collateral or proceeds therefrom, because the creditor has not received anything greater than it would have received in bankruptcy if the transfer had not been made.

The trustee has asserted several errors regarding the Bankruptcy Judge's findings of fact and conclusions of law on the issue of preferential transfer. First, the trustee contends that the Bankruptcy Judge erred as a matter of law in finding that the sale of Jersey Coast stock was not a preferential transfer under section 547. The trustee's position is that because the subsidiary's stock was not collateral for MNC's loan, proceeds from its sale do not fall within the ambit of sections 363(f) or 725. In its assessment of the transaction, however, the Bankruptcy Judge looked beyond the form of the

sale to its substance. In so doing, he found that although the transaction was labeled a sale of stock it was in effect an assumption of the subsidiary's debt in exchange for the entity's assets plus assignment of a note to MNC. Thus, the Bankruptcy Judge held that only the assignment of the note constituted a preferential transfer to MNC; this Court agrees with the Bankruptcy Judge's analysis and conclusions.

Turning to the Jersey Coast transaction, the Bankruptcy Judge found that on the date of the stock sale Jersey Coast's assets were valued at $2,777,988.00 while its liabilities totaled $3,829,942.00. Thus, he concluded that it was inconceivable that any buyer would pay $1,700,000.00 (the buyer agreed to assume $1,619,805.45 of liabilities to MNC and give the debtor a $100,000.00 note, which was assigned to MNC) for the company. In addition, the Bankruptcy Judge recognized that because MNC had a security interest in all of Jersey Coast's inventory, receivables, and equipment, only the note transferred from the debtor to MNC constituted a preferential transfer since only the note represented a value for the stock above the secured assets of the Jersey corporation itself. Thus, aside from the two monthly payments on the note that may have been received by MNC from Jersey Coast's buyer, MNC was not transferred any asset that would have been otherwise available to unsecured creditors in a Chapter 7 liquidation. The Bankruptcy Judge's analysis of this issue appears to represent a sound application of the principles of section 547.

■■■ The trustee next contends that MNC received a preferential transfer pursuant to section 547(c)(5). Section 547(c)(5) protects holders of perfected security interests in inventory and/or receivables. The provision states in pertinent part:

(c) The trustee may not avoid under this section a transfer—

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors

holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of *all security interests for such debt* on the later of—....

*Id.* § 547(c)(5) (1993) (emphasis added). The effect of section 547(c)(5) is to prevent the secured creditor with a floating lien from improving its secured position during the ninety days pre-petition at the expense of the unsecured creditors. *See In re Clark Pipe & Supply Co., Inc.,* 893 F.2d 693 (5th Cir.1989). The purpose of section 547(c)(5) is stated clearly in its legislative history:

[This subsection] codifies the improvement of position test, and thereby overrules such cases as *DuBay v. Williams* [417 F.2d 1277 (9th Cir.1969)]. A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90–day period before bankruptcy. The test is a two point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of petition....

H.R.Rep. No. 95–595, 95th Cong., 1st Sess., at 374 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6330. Thus, a creditor with a perfected security interest in inventory and/or receivables receives a preference only to the extent that its position has improved during the ninety days pre-petition, unless it has provided new value to the debtor.

■■■ The trustee's objection concerns the scope of MNC's security interest on November 1, 1985. Specifically, the trustee asserts that the Bankruptcy Judge erred in considering the assets of the debtor's subsidiaries, Merrey and Jersey Coast, as part of MNC's security to secure the debtor's loan. The Bankruptcy Judge succinctly reasoned, however, that the Merrey and Jersey Coast assets should be combined with the debtor's assets for purposes of the two-point test for preferential transfer. The Judge found that MNC's floating lien and the loan mechanism itself treated all three entities as one. Moreover, MNC made daily advances to all three companies by funding one account, and all

three entities had their receivables paid to MNC. Also, in calculating how much money to advance to the debtor, the debtor's daily report did not divide the loan balance between the three corporations. Accordingly, in performing the calculation under section 547(c)(5), the judge held that the total debt and assets for the three entities combined should be examined on November 1, 1985 to determine the improvement, if any, of MNC's position ninety days later. This Court rejects the trustee's argument and finds that the Bankruptcy Judge correctly considered the substance of the interrelation between the debtor, its two subsidiaries and the loan to find that all three entities should be combined to determine the total debt and assets for the purpose of calculating MNC's improvement in position under section 547(c)(5).

■ MNC, on the other hand, disputes the Bankruptcy Judge's findings regarding the value of its security interest ninety days prior to and on the date of the filing of the bankruptcy petition. Specifically, MNC argues that the Bankruptcy Judge erred in finding that the amount of inventory missing from the debtor on November 1, 1985 (ninety days pre-bankruptcy) was $3,200,000 and that the amount missing on January 31, 1986 (the date of the bankruptcy petition) was $3,000,000. In contrast, MNC maintains that approximately $3,000,000 was missing from the debtor's assets on both dates.

Upon liquidation of the debtor's assets, the trustee discovered that instead of the approximately $9,007,270.00 of inventory reported by the debtor to MNC on January 31, 1986, the debtor's inventory actually totaled approximately $6,000,000. Based on the determination that the debtor and its two entities should be treated as a whole, the Bankruptcy Judge reasoned that since $3,000,000 represented one-third of the inventory the debtor was supposed to possess on January 31, 1986, then one-third of the inventory was also missing from the total inventory of all three entities on November 1, 1985. Accordingly, the judge combined the figures for all three entities and found that the total inventory listed on November 1, 1985 was $9,678,574.00 thus the missing inventory amounted to approximately $3,200,000 on November 1st and

$3,000,000 on January 31st. The Bankruptcy Judge then used these figures to conclude that on November 1, 1985 the amount of debt unsecured by collateral was $3,602,181 compared with an unsecured debt of $3,436,078 on January 31, 1986. Therefore, the Bankruptcy Judge found an improvement in position by MNC in the amount of $166,103.

MNC takes the view, however, that on November 1, 1985, $3,000,000 was missing solely from the debtor's inventory and that nothing was missing from the two subsidiaries. Therefore, MNC maintains that $3,000,000 was missing on both November 1, 1985 and January 31, 1986. MNC's argument appears to be premised on the conclusion that the three entities should be considered separately for purposes of determining the amount of missing inventory. Given that this Court has determined that the Bankruptcy Judge correctly combined the three entities for purposes of valuation issues, we reject MNC's argument. Accordingly, the Bankruptcy Judge's findings of fact with respect to the value of MNC's security interest are not clearly erroneous and appear to be legally sufficient to support the conclusion that MNC improved its position during the ninety days before bankruptcy and thereby received a preferential transfer in the amount of $166,103.00.

## VIII. CONCLUSION

For the foregoing reasons, the judgments that the Bankruptcy Court entered against MNC and for the tobacco company plaintiffs on their equitable subordination claims (Philip Morris—$201,111.11; and R.J. Reynolds—$143,820.90) will be reversed. Additionally, since this Court has determined that there was no basis under 11 U.S.C. § 546(c) and 13 Pa.Cons.Stat.Ann. § 2702 for reclamation, the following judgments of the Bankruptcy Court entered against MNC and for the tobacco companies will be reversed: American Tobacco—$59,387.47; Lorillard—$374,636.00; Philip Morris—$619,589.40; and R.J. Reynolds—$537,764.80. Finally, the judgment of voidable preference pursuant to section 547 that the Bankruptcy Court entered against MNC and in favor of the trustee in the amount of $166,103.00 is affirmed. Accord-

ingly, the order of the Bankruptcy Court is affirmed in part and reversed in part.

### *JUDGMENT ORDER*

AND NOW, on this 18th day of November, 1993, and for the reasons set forth in this Court's opinion dated November 18, 1993,

IT IS ORDERED: The Bankruptcy Court's judgments entered against MNC and in favor of the tobacco company plaintiffs as to equitable subordination pursuant to 11 U.S.C. § 510(c) in the following amounts: Philip Morris—$201,111.11; and R.J. Reynolds—$143,820.90 are hereby **REVERSED.**

IT IS FURTHER ORDERED: The Bankruptcy Court's judgments entered against MNC and in favor of the tobacco company plaintiffs as to reclamation pursuant to 11 U.S.C. § 546(c) and 13 Pa.Cons. Stat.Ann. § 2702(b) in the following amounts: American Tobacco—$59,387.47; Lorillard—$374,636.00; Philip Morris—$619,589.40; and R.J. Reynolds—$537,764.80 are hereby **REVERSED.**

IT IS FURTHER ORDERED: For the reasons set forth in this Court's opinion dated November 18, 1993, the Bankruptcy Court's judgment against MNC and in favor of the trustee in the amount of $166,103.00 pursuant to 11 U.S.C. § 547 is hereby **AFFIRMED.**

IT IS FURTHER ORDERED: This matter is **REMANDED** to the Bankruptcy Court for further proceedings as may be necessary to effectuate the Order of this Court.